**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BONNIEVIEW HOMEOWNERS ASSOCIATION, LLC, Et al. <br><br>                Plaintiff, <br><br>    v. <br><br>WOODMONT BUILDERS, LLC, Et al, <br><br>                Defendants. | CIVIL ACTION NO. 03-4317 (DRD) <br><br><br><br>**OPINION** |

<u>Appearances</u>

RIKER, DANZIG, SCHERER, HYLAND, & PERRETTI, LLP
Jeffrey B. Wagenbach, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
    *Attorneys for Plaintiffs*

SZAFERMAN, LAKIND, BLUMSTEIN, BLADER, & LEHMAN, P.C.
Jeffrey P. Blumstein, Esq.
Quakerbridge Executive Center
101 Grovers Road, Suite 104
Lawrenceville, New Jersey 08648
    *Attorneys for Defendant Post, Buckley, Schuh & Jernigan, Inc.*

HACK, PIRO, O'DAY, MERKLINGER, WALLACE, & MCKENNA
Peter A. Piro, Esq.
30 Columbia Turnpike
Post Office Box 941
Florham Park, New Jersey 07932
    *Attorneys for Defendants Jacob Dunnell, III and Princeton Hydro, LLC*

WOLFF & SAMSON, P.C.
Gage Andretta, Esq.
1 Boland Avenue
West Orange, New Jersey 07052

*Attorneys for Defendants Woodmont Builders, Woodmont Court, David Mandelbaum, Nathan Mandelbaum, Ronald G. Targan, Leslie J. Koralek, Richard W. Koralek, and Associated Sales, Inc.*

## *OPINION*

**DEBEVOISE, Senior District Judge**

The plaintiffs in this action, Bonnieview Homeowners Association, LLC ("Plaintiffs") are fifteen homeowners who live on Bonnieview Lane in Montville Township, New Jersey. After purchasing their homes, Plaintiffs learned that their properties were contaminated by hazardous substances. These contaminants were left over from pesticides used many years earlier when the properties formed one parcel of land operated as an apple orchard. Plaintiffs seek damages for costs incurred because the contamination was not discovered and/or disclosed to them prior to purchasing the property.

Plaintiffs have filed suit against the builders of their homes ("Woodmont Builders"), the previous owners of the residential lots on which their homes were built ("Woodmont Court"), and the individual owners of the land prior to its subdivision.[1] Plaintiffs have also sought damages from the real estate brokerage firm that arranged the sale of the property ("Associated Sales"), the Township ("Montville"), and the environmental consulting firms which assessed the land on different occasions before the sales took place, Post, Buckley, Schuh, & Jernigan, Inc. ("PBS&J"), Princeton Hydro, LLC ("Princeton Hydro"), and Maser Consulting, P.A. ("Maser").

In two previous decisions, the Court dismissed Plaintiffs' claims against the

---

[1]These defendants are Woodmont Builders, LLC, Woodmont Court at Montville, LLC, David Mandelbaum, Nathan Mandelbaum, Ronald G. Targan, Leslie J. Koralek and Richard W. Koralek as co-trustees under the Anita S. Koralek living trust. These three categories of defendants, and Associated Sales, Inc. will be referred to as the "Woodmont Defendants."

environmental consulting firms for failure to file an Affidavit of Merit in accordance with N.J.S.A. 2A:53A-26 *et seq*. <u>Bonnieview Homeowners Ass'n et al. v. Woodmont Builders et al.</u>, No. 03-4317 Slip Ops. (D.N.J. Oct. 6, 2005 and Nov. 22, 2005).    However, the Woodmont Defendants asserted cross-claims against the environmental consultants, and the Court declined to dismiss those cross-claims.  In particular, the Woodmont Defendants assert claims of negligence and contribution against PBS&J.  The Woodmont Defendants allege that PBS&J's negligent performance of a Phase I environmental assessment was the direct cause of their failure to inform Plaintiffs of the contamination.  Princeton Hydro has also filed a cross-claim against PBS&J.

Presently before the Court is PBS&J's motion for summary judgment dismissing the cross-claims filed by the Woodmont Defendants and Princeton Hydro.  For the reasons stated below, the motion will be denied as to the Woodmont Defendants' cross-claims and granted as to Princeton Hydro's cross-claim.

## *FACTS*

Plaintiffs currently reside on property that, prior to its subdivision, constituted part of a 131-acre tract of land known as Bonnieview Farms.  Bonnieview Farms operated as an apple orchard for a number of years prior to 1970.  In 1970, the property was purchased by a group of investors ("the Mandelbaums") and was left essentially vacant and undeveloped until the mid-1990's.  In the 1990's, the Mandelbaums entered into an agreement with Woodmont Builders to subdivide and transform the entire tract of land into a residential development.  Under the agreement, Woodmont would obtain the necessary governmental approvals and construct and sell the houses built on the 131 acre area.

Sometime prior to August 1997, Woodmont submitted a conceptual plan and a preliminary subdivision application to build 47 one-family residences on the 131-acre tract. However, the Township had other plans for this property. The Township planned to acquire the entire tract and preserve it as open space for passive recreational use. In the Summer of 1997, the Township submitted an application to the Morris County Open Space and Farmland Preservation Trust Fund for assistance in acquiring the entire 131-acre tract in fee simple. The Application noted that the site had formerly been an "Orchard Farm" and contained "Large Apple, Oaks and Maple trees on site by observation." On November 14, 1997 the County approved a grant of $500,000 to the Township to be applied toward the acquisition of the land.

The County required Phase I environmental assessments to be performed on any property financed in part through the Morris County Open Space and Farmland Preservation Trust Fund. In order to fulfill this requirement, on January 14, 1998, the County entered into a contract with Coastal Environmental Services, Inc., for Coastal to perform an assessment of the 131 acre tract. Shortly thereafter, Coastal was acquired by PBS&J, which undertook the environmental assessments under the contract with the County.

In April 1998, PBS&J completed its Phase I assessment of the tract and sent a report to the County. In its report, PBS&J noted that the objectives of a Phase I environmental assessment are "to determine if current or past land use practices have adversely impacted the site, to identify any other potential environmental concerns, and to determine if additional field investigations are warranted." PBS&J further noted "[t]his report was prepared to satisfy the requirements of most lending institutions for a "Phase I Environmental Audit" and was "based on the guidelines established by the American Society of Testing and Materials, the Federal National Mortgage

Association ("Fannie Mae"), the Federal Home Loan Board, and the New Jersey Department of Environmental Protection's Technical Requirements for Site Remediation (N.J.A.C. 7:26E)."

PBS&J notified the County that no sampling is conducted at the Phase I level and listed the limitations of a Phase I study as follows:

> 1. No attempt was made to verify the compliance of current or former landowners of the site with pertinent Federal, State or local environmental regulations.
>
> 2. A data review of Federal and State database information was conducted on the material provided in Appendix B. ... it should be recognized that an accurate evaluation of all potential environmental concerns cannot be made without a more comprehensive investigation which may require soil and/or water analyses.
>
> ...
>
> This environmental assessment should not be regarded as an assurance that environmental concerns beyond those which could be determined within the scope of work of this investigation are not present at or near the site.
>
> This report is for the exclusive use of the County of Morris, Department of Planning & Development as it applies to an evaluation of Block 21.01, Lot 42 and Block 21.02, Lot 42 (Bonnieview Property) in Montville Township, Morris County, New Jersey. It has been prepared in accordance with generally accepted practices in environmental assessments. ...

In its report, PBS&J recognized the fact that the site "was forested (orchards) naturally occurring" and also noted that there was evidence of a former "tree nursery." The summary and recommendations of PBS&J's Phase I assessment designated only three areas of concern. Those areas included: (1) an area containing several storage containers (aboveground storage tanks and

5

drums) of varying sizes; (2) an area containing scattered debris (including abandoned automobiles, tires, and construction debris); and (3) concrete foundations appearing to have underground storage tanks.  With regards to the first two areas of concern, PBS&J noted that "[w]hile none of the observed debris was considered hazardous, additional material in lower layers could be classified as such.  No sampling is recommended for this area at this time; however, when the debris is removed, the lower layers should be carefully examined."  PBS&J recommended the use of ground penetrating radar to confirm or refute the presence of underground storage tanks at the third area.  PBS&J did not discover the preexisting environmental contamination caused by the use of pesticides during the operation of Bonnieview Farms as an apple orchard many years earlier.

On April 9, 1998, the Township Planning Board denied Woodmont's subdivision application, presumably because it intended to acquire Bonnieview Farms and preserve the land as open space.[2]  Shortly thereafter, Woodmont filed suit in the Superior Court of New Jersey, contesting the Planning Board's denial of the subdivision application.  Woodmont and the Township entered into settlement discussions, and in September 1998, agreed that Woodmont would be permitted to subdivide a portion of the property and build 25 residential lots on approximately 30 acres.  In exchange, Woodmont agreed to sell the remaining 100 acres to the Township, which would preserve the land as open space.  The planning board passed a resolution incorporating this agreement on October 22, 1998.  As part of the agreement, Woodmont agreed to remove any debris on the property that had been discovered during PBS&J's Phase I

---

[2]On April 23, 1998, the County forwarded a copy of PBS&J's Phase I assessment to the Township "in accordance with the procedures for grant awards from the Open Space and Farmland Trust Fund."

assessment.

In a letter dated October 22, 1998, Woodmont represented that neither it nor the Mandelbaums had "any knowledge as to the presence of any kind of hazardous substance or the like." At some point, the Township forwarded a copy of PBS&J's Phase I assessment to Woodmont, which forwarded the report to First Union National Bank in an attempt to obtain financing for the project.[3]

In early 1999, the Township hired Princeton Hydro to conduct a subsequent inspection of the property to ensure that the debris discovered in PBS&J's inspection had been cleaned up prior to the conveyance of the land intended to be used as open space. On May 10, 1999, Princeton Hydro represented that the property had been cleared. On July 13, 1999, the Mandelbaums conveyed the 100 acres intended to be used as open space, to the Township.

In December of 1999 the Township was notified by a resident who had been walking in the open space portion of the subject property that, contrary to the report issued by Princeton Hydro, the debris and junk reported in PBS&J's Phase I report remained at the site. This discovery prompted Township officials to perform a subsequent inspection of the property, which revealed that the debris had in fact remained on site. On April 2, 2000, the Township Engineer recommended that "subsurface soil testing should be performed at each designated area of concentrated surface debris to the satisfaction of the Township Health Department to determine soil contamination." Pursuant to this recommendation, the Township hired Maser to perform this testing in the summer of 2000.

---

[3]Woodmont did not obtain permission from PBS&J to use their report in this manner. Ultimately, Woodmont ended up obtaining financing from Valley National Bank, which did not require a Phase I assessment report.

Maser did not complete its testing on the 100 acre portion of the property that had been conveyed to the Township until 2002.[4] By letter dated September 3, 2002, Maser reported that it had discovered unsafe levels of lead, arsenic, DDT, and other contaminants in the soil of the property that were associated with historic orchard land use. Maser advised that "[b]ased on the historical aerials, MC believes the 25-lot residential subdivision under construction from which the open space was originally subdivided may also have been part of the same orchard and may contain constituents elevated above the [Residential Direct Contact Soil Cleanup Criteria]. ... The Township Board of Health Involvement may be warranted at this time to advise the public regarding the contaminated soils at the site and the adjacent subdivision." In April 2003, the Township informed Plaintiffs that it was suing the Woodmont Defendants for failing to clean up the property, and that they were invited to a "special meeting" where the residents could discuss this matter. On May 30, 2003, the Township informed Plaintiffs that the soil testing on their property was complete and that the residential tracts also contained levels of contaminants exceeding the NJDEP limits.

On September 12, 2003, Plaintiffs filed the Complaint in the present case. On October 17, 2003, Princeton Hydro filed its answer along with a cross-claim against PBS&J. On July 1, 2004, the Woodmont Defendants filed their Answer, which contained cross-claims against PBS&J. Woodmont's cross-claims allege that PBS&J:

> ... knew or should have known, and it was reasonably foreseeable, that the Report would be used in connection with the acquisition by Montville Township from the Individual Defendants of a major portion of the 130-acre site that was the subject of the Report as well

---

[4] By this time, the adjacent subdivided tracts of land had already been developed by Woodmont and sold to Plaintiffs.

8

>as Woodmont's development for single family housing of a portion of the site.

Woodmont further asserts that:

>Woodmont and the Individual Defendants reasonably and foreseeably relied upon the Post Buckley Report in proceeding with the sale of the property and the development of Woodmont's 25-lot subdivision... [and] have been damaged by the failure on the part of Post Buckley to exercise reasonable care in the preparation of its Report and the performance of its duties.

Presently before the Court is PBS&J's motion for summary judgment dismissing Woodmont's cross-claims.[5]

## *DISCUSSION*

I.   Summary Judgment Standard

Summary Judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. In deciding whether there is a disputed issue of material fact, the Court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255. But where the

---

[5]PBS&J has additionally moved for dismissal of the cross-claim filed by Princeton Hydro. Princeton Hydro has not opposed this portion of the motion, and the Court will dismiss that cross-claim accordingly.

9

nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

PBS&J has moved for summary judgment dismissing Woodmont's cross-claims. In support of its motion, PBS&J argues that it owed no duty to the Woodmont Defendants, and that dismissal of the cross-claims would not prejudice the remaining co-defendants in their ability to obtain the benefit of the New Jersey Comparative Negligence Act.

II.     Duty to the Woodmont Defendants

In New Jersey, the existence of a duty is a "matter of law properly decided by the court." See Carvalho v. Toll Brothers and Developers, 143 N.J. 565, 572 (1996). Ultimately, the "question of whether a duty exists in a particular case is a question of fairness and policy that implicates many factors." Id.. Among these factors, the foreseeability of injury to others from defendant's conduct is the most important. Id. The "foreseeability" factor does not, by itself, establish the existence of a duty, but it is a "crucial element in determining whether imposition of duty is ... appropriate." Id. at 573. "Once the foreseeability of an injured party is established ... considerations of fairness and policy govern whether the imposition of a duty is warranted." Id. At this stage, the court must identify, weigh, and balance several factors which include: the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Id. While there is a connection between the concept of foreseeability and other factors, the "foreseeability of harm is susceptible to an objective analysis, while the resolution of fairness and policy is a much less certain determination." Id. The magnitude and likelihood of potential harm are objectively

determinable, but the propriety of imposing a duty of care is not.  See Weinberg v. Dinger, 106 N.J. 469, 485 (1987).

It is well settled that although an environmental consultant must conform to a standard of care possessed by members of the profession in good standing, it only owes a duty to those persons who fall normally and generally within a zone of risk created by the tortious conduct and is therefore foreseeable. See Sykes v. Propane Power Corp., 224 N.J.Super. 686 (App.Div.1988). This does not "require a specific forecasting of particularly identifiable victims" See Id.  "That a plaintiff may be found within a range of harm emanating from tortfeasor's activities is more significant than whether the parties stand in a direct contractual relationship." Carter Lincoln-Mercury Inc., Leasing Division v. EMAR Group, Inc., 135 N.J. 182 (1993).  Lack of privity is no bar to recovery.  Id.  In the instant case, PBS&J's duty then turns on whether or not it was foreseeable that the Phase I assessment would be transferred to, and relied upon by the owner of the property in giving assurances to buyers.

The Woodmont Defendants (cross-claim Plaintiffs for the subject of this motion) argue that PBS&J's duty of care extended to all parties who had a proprietary interest in the Bonnieview Property (namely the Township and the Woodmont Defendants) because it was foreseeable that those parties would rely on the Phase I Assessment.  Woodmont argues that since the scope of work required PBS&J to identify "recognized environmental conditions" at Bonnieview Farms, PBS&J's duty extended to all parties with a proprietary interest in the property.  The extension of PBS&J's duty then turns on whether or not it was foreseeable that the Phase I assessment would be transferred to, and relied upon by the owner of the property in giving assurances to buyers.

In Grand Street Artists v. General Elec. Co., 19 F.Supp.2d 242, 248 (D.N.J.,1998), the

11

Court ruled that an environmental consultant who provides assistance, pursuant to the Environmental Cleanup Responsibility Act ("ECRA"), to an owner who wishes to cease operations, owes a duty to a plaintiff who has relied upon a review of the owner's ECRA submissions in making the decision to purchase the premises and convert them for residential use. Woodmont has relied heavily on this case in opposing PBS&J's motion.

In reaching the decision in Grand Street Artists, Judge Ackerman reasoned that liability for professional negligence on the part of an environmental consultant should be considered in a similar fashion to the liability imposed on professionals such as lawyers and accountants to third parties. Id. at 248. Accordingly, the Court must focus on the "objective purpose" of the consultant's services to determine if the duty should extend to third parties. Id. (citing Petrillo v. Bachenberg, 139 N.J. 472 (1995)). In Sykes, the Superior Court of New Jersey - Appellate Division determined that "the duty to foresee ... should be commensurate with the degree of responsibility which the engineer has agreed to undertake." 224 N.J. Super. at 694. This leads the Court to consider the original purpose of the Phase I assessment in deciding whether PBS&J's duty extended beyond the County.

The purpose of the Phase I assessment, as provided by PBS&J, was to "determine if current or past land use practices have adversely impacted the site, to identify any other potential environmental concerns, and to determine if additional field investigations are warranted." PBS&J performed the assessment for the County to ensure that the land, the purchase of which was financed in part by the County, was free from contamination, and to advise if further testing would be necessary. The purpose behind the County's Phase I requirement was to prevent the expenditure of public funds on contaminated property. Open space acquisition and preservation exists in the County to "assure Morris County's longstanding tradition of maintaining a high

12

quality of life through the acquisition of open space, recreational lands, and areas of environmental significance." Upon taking on the responsibility to perform the assessment, PBS&J representatives knew that the Phase I was being performed as a precursor to the sale of the Bonnieview property. PBS&J, like Jenny Engineering Corp. ("Jenny") in <u>Grand Street Artists</u>, was properly on notice that the property in question would be sold once its assessment was completed, and that the assessment was to be used in conjunction with the sale. PBS&J agreed to undertake the responsibility "to determine if current or past land use practices have adversely impacted the site." This is the duty Woodmont alleges has been breached, and further alleges that it was foreseeable that the owners and buyers of the property might rely on the assessment.

  PBS&J advances powerful arguments that the duty that PBS&J undertook when it performed a Phase I Environmental Assessment for the County did not extend to a commercial developer of real estate not in contemplation of PBS&J when it undertook the assessment. The report itself states that "[t]his report is for the exclusive use of the County of Morris, Department of Planning & Development, as it applies to an evaluation of Block 21.01, Lot 42 and Block 21.02, Lot 42 [the Bonnieview Property] in Montville Township, Morris County, New Jersey." The report further stated that it was "based on the guidelines established by the American Society of Testing and Materials... and the New Jersey Department of Environmental Protection's Technical Requirements for Site Remediation (N.J.A.C. § 7:26E)." PBS&J issued its Report in April, 1998.

  N.J.A.C. § 7:26E includes the guidelines (at § 3.1) for a Phase I environmental assessment. The NJDEP has stated that its Technical Rules were consistent with the "approach used by the American Society for Testing and Materials with regard to ecological evaluations."

13

2003 WL 22053346 at 8. The ASTM Standard for "environmental site assessments: Phase I environmental site assessment process" is set forth at ASTM Standard E1527.

ASTM E1527-97 states:

> 4.5.4 Comparison With Subsequent Inquiry - It should not be concluded or assumed that an inquiry was not appropriate inquiry merely because the inquiry did not identify recognized environmental conditions in connection with a property. Environmental Site Assessments must be evaluated based on the reasonableness of judgments made at the time and under the circumstances in which they were made. Subsequent environmental site assessments should not be considered valid standards to judge the appropriateness of any prior assessment based on hindsight, new information, use of developing technology or analytical techniques, or other factors.

PBS&J has pointed to evidence that NJDEP set up an Historic Pesticide Contamination Task Force in 1997. Its final report relating to "findings and recommendations for the remediation of historic pesticide contamination" was issued in March 1999, after issuance of PBS&J's Phase I Report. PBS&J also pointed to evidence that in 1998 "[h]istoric pesticides just wasn't a typical issue that was being identified," (Blumstein Supp. Decl. Ex. "B" at T:42-2to 8) and "[a]t that time, it wasn't generally looked at as an area of concern, and even when those rules were promulgated, the different component is that there was no mechanism to make someone sample farm fields, or orchards, or any potential area of agricultural pesticides, and there still isn't." (Id. at T:57-7 to 19).

Further, the reliability of a Phase I Assessment has a limited life span. As stated in ¶ 46 of ASTM E1527-97:

> 4.6 Continued Viability of Environmental Site Assessment - An environmental site assessment meeting or exceeding either Practice E1528 or this practice and completed less than 180 days previously is presumed to be valid. An environmental site assessment meeting or exceeding either practice and completed more than 180 days previously may be used to the extent allowed by 4.7 through 4.7.5.

14

PBS&J points out that the Woodmont Defendants have put forward no evidence to establish that they undertook any of these steps before relying upon the April 1998 Phase I Assessment when they purchased and developed the Bonnieview residential property. The 180 day period of presumed validity of PBS&J's Report elapsed as of October 1998. Woodmont sent a copy of that Report to First Union on March 25, 1999. Woodmont closed on the 30-acre parcel and obtained its construction financing in late June 2000.

Woodmont relies heavily upon Grand Street Artists which applied to New Jersey's foreseeability of injury rule - "the court must identify, weigh and balance several factors which include: 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." 19 F. Supp. 2d at 248. There are several factors that distinguish Grand Street Artists from the instant case. Jenny was engaged by the owner of an industrial property to provide technical assistance in the ECRA process necessary to obtain approval of the cessation of industrial uses at the site. "The version of ECRA that existed at the time impose[d] a number of conditions upon the cessation of operations by the owner of an industrial establishment. See N.J.S.A. § 13:1k-1 through 14 (1990)." Id. at 244.

ECRA involved an approach by the New Jersey Legislature to solve the hazardous waste problems arising from prior uses of land for industrial purposes. When an industrial property is either closed or sold, the owner must file a General Information Submission ("GIS")("ECRA-1 Submission") and a State Evaluation Submission ("SES")("ECRA-2 Submission") for NJDEP's review and approval. These Submissions are public records centrally maintained by the NJDEP and would be available for consultation by anyone seeking to purchase the industrial property. Jenny's services in connection with the owner's ECRA Submissions extended more than three

years.  Jenny knew that the premises would be sold once the ECRA process was completed.  The contrast between a Phase I Environmental Assessment and ECRA Submissions and between the role of Jenny in Grand Street Artists and the role of PBS&J in the instant case is very great, limiting the precedential value of Grand Street Artists.

PBS&J has presented substantial evidence that it was not negligent and it has presented substantial evidence that either the Woodmont Defendants did not rely on the Phase I Environmental Assessment Report, or if they did rely on the Report, that their reliance was not reasonable.  Negligence, reliance and the reasonableness of any reliance raise issues of fact and cannot be decided on a motion for summary judgment.

The Court is not prepared at this juncture and in the present complex state of the record to hold as a matter of law that PBS&J owed no duty of care to the Woodmont Defendants.  The 180-day limitation on the reliability of the Report existed primarily to guard against new contamination that might affect a property after an assessment has been made.  See ASTM E1527-97, 4.6 through 4.72.  Due to its historical use as an orchard, Bonnieview Farms was contaminated long before PBS&J performed its assessment.  Further, although PBS&J believed that Bonnieview Farms was going to be preserved as open space and not converted into a residential development, it was not unreasonable to anticipate that at least some of the property would be devoted to residential use.

## CONCLUSION

The basis for finding that a duty exists is whether the reasonably prudent person at the time should recognize and foresee an unreasonable risk or likelihood of harm to others when undertaking his or her actions.  Rappaport v. Nichols, 31 N.J. 188, 201 (1959).  Ultimately in this

case, the Court will have to decide this question. For the reasons set forth above, it is not prepared to do so at this time. PBS&J's motion for summary judgment dismissing the Woodmont Defendants' cross-claims will be denied without prejudice to its right to move for judgment in its favor on this ground at an appropriate time during the trial of the case. PBS&J's motion for summary judgment dismissing Princeton Hydro's cross-claims will be granted. The Court will file an order implementing this opinion.

          /s/ Dickinson R. Debevoise
          Dickinson R. Debevoise, U.S.S.D.J.

July 11, 2006