<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BONNIEVIEW HOMEOWNERS ASSOCIATION, LLC; JUAN F. and RAFAEL HERNANDEZ; RENE N. and STEPHEN J. HROP; RENEE K. GOODLOW and MICHAEL R. BERRY; YUANGEN ZHU and QI LIU; G. THOMAS and SHARON PERRONE; SAN CHEE and GEORGE LEE; PARHAT and SEMA YASAR; FAZAL and SANYAKHAN BARI; JAMES and DIANE SADOWSKI; DANIEL and PAULINE ROH; LOUISE ANN and BRUCE DOSTAL; JOSEPH and BOBBI INTILE; YI LU and BRUCE TANG; and KEITH HAMILTON, | Civ. No. 03-4317 (DRD) |
|         Plaintiffs, | **O P I N I O N** |
|    v. | |
| WOODMONT BUILDERS, L.L.C.; WOODMONT COURT AT MONTVILLE, L.L.C.; DONALD WITMONDT; ASSOCIATED SALES, INC.; DAVID MANDELBAUM and KAREN A. MANDELBAUM; NATHAN MANDELBAUM; RONALD G. TARGAN and JUDITH TARGAN; ANITA S. KORALEK; LESLIE J. KORALEK, as Co-Trustees under the Anita S. Koralek Living Trust; and MONTVILLE TOWNSHIP, | |
|         Defendants. | |

*Appearances by:*

Jeffrey B. Wagenback, Esq.
Stephen W. Smithson, Esq.
Jaan M. Haus, Esq.

1

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

    *Attorneys for Plaintiffs*


Lee Henig-Elona, Esq.
Gage Andretta, Esq.
WOLFF & SAMSON PC
One Boland Drive
West Orange, New Jersey 07052

    *Attorneys for Defendants Woodmont Builders, L.L.C., Woodmont Court at Montville,*
    *L.L.C., Donald Witmondt; Associated Sales, Inc.; David Mandelbaum and Karen A.*
    *Mandelbaum; Nathan Mandelbaum; Ronald G. Targan and Judith Targan; Anita S.*
    *Koralek; Leslie J. Koralek, as Co-Trustees under the Anita S. Koralek Living Trust*

Gregory J. Coffey, Esq.
Richard J. Dewland, Esq.
COFFEY & ASSOCIATES
465 South Street
Morristown, New Jersey 07960

    *Attorneys for Defendant Montville Township*


**DEBEVOISE, Senior District Judge**

    This matter involves a dispute over the environmental contamination of an area of land in

Montville, New Jersey, where a fruit orchard was operated in the mid-twentieth century and

which was later developed into a residential neighborhood.  The Bonnieview Homeowners

Association, L.L.C. ("Bonnieview") and members of that association, the Individual Plaintiffs,[1]

---

[1] The "Individual Plaintiffs" are the current or former owners of thirteen homes on Bonnieview Lane: Juan F. and Rafael Hernandez; Rene N. and Stephen J. Hrop; Renee K. Goodlow and Michael R. Berry; Yuangen Zhu and Qi Liu; G. Thomas and Sharon Perrone; San Chee and George Lee; Parhat and Sema Yasar; Fazal and Sanyakhan Bari; James and Diane Sadowski; Daniel and Pauline Roh; Louise Ann and Bruce Dostal; Joseph and Bobbi Intill; Yi Lu and Bruce

(collectively, "the Plaintiffs") assert various causes of action arising out of that environmental contamination against Woodmont Builders, L.L.C. ("Woodmont Builders"); Woodmont Court at Montville, L.L.C. ("Woodmont Court") (together, "Woodmont Properties); Donald Witmondt (together with Woodmont Properties, "Woodmont"); Associated Sales, Inc. ("Associated Sales"); David Mandelbaum, Karen A. Mandelbaum, Nathan Mandelbaum, Ronald G. Targan, Judith Targan, Leslie J. Koralek and Richard W. Koralek as Co-Trustees under the Anita S. Koralek Living Trust (together, the "Individual Defendants"); and Montville Township ("Montville").

Woodmont, Associated Sales and the Individual Defendants (together, the "Woodmont Defendants") assert counterclaims against the Plaintiffs. The Woodmont Defendants also assert a cross-claim against Montville.

The original complaint in this case was filed on September 12, 2003. The Plaintiffs filed their First Amended Complaint ("FAC") on February 15, 2005. On August 19, 2009, after the parties had already filed their motions for summary judgment, the Plaintiffs filed their Second Amended Complaint ("SAC"), which added Donald Witmondt, the managing member of Woodmont Builders and Woodmont Court and president of Associated Sales, as a defendant. Because Mr. Witmondt was not a party to the action at the time these motions were briefed and argued, the court will not grant judgment <u>against</u> Mr. Witmondt on any counts at this time, but will grant summary judgment dismissing counts against Mr. Witmondt if appropriate. Additionally, although the operative complaint in this matter when these motions for summary judgment were filed was the FAC, the court will address these motions as directed to the SAC, given that the SAC is now the operative complaint. The SAC is, in any case, substantially the

Tang; and Keith Hamilton.

same as the FAC except for the addition of Mr. Witmondt as a defendant.

The court is aware that, at one time, Woodmont Court and the Plaintiffs were engaged in arbitration.  While the court is unaware of the status of that arbitration, both the Plaintiffs and Woodmont Defendants consented to the inclusion of Woodmont Court in these proceedings for summary judgment (see Pls.' Opp'n Br. 64) and the court will proceed accordingly.

The Woodmont Defendants and Montville now move for summary judgment to dismiss all counts of the SAC.  The Plaintiffs move for partial summary judgment on some counts of the SAC and to dismiss the Woodmont Defendants' counterclaims and two of the defenses pled in their Answer.  For the reasons set forth below, the Woodmont Defendants' motions will be granted in part and denied in part; Montville's motion will be granted; and the Plaintiffs' motions will be granted in part and denied in part.

## I.  BACKGROUND

### A.    The Property

The land that is the subject of this litigation was originally comprised of approximately 130 contiguous acres in the Township of Montville, Morris County, New Jersey ("the Property").  Bonnie View Farms, which is not a party to this litigation, owned and operated the Property for agricultural purposes, including as a fruit orchard, from 1941 until it was abandoned some time prior to 1970.  In 1970, the Individual Defendants obtained title to the Property.  Mr. David Mandelbaum testified that when the Individual Defendants purchased the Property it was not being farmed, but that he knew it had been previously used as an apple orchard.  He also testified that the land was not farmed from the time that the Individual Defendants purchased the Property until approximately 1988.  Sometime after 1988, a portion of the Property was used for foresting.

4

A June 27, 1989 letter from William Roe, the consulting forester at the Property, reflects that he had been managing the property since 1975, at which time he completed an "inventory and plan." This document also reflects that there was a timber sale at the Property in 1977.

The Woodmont Defendants maintain that the Property was never used for agriculture other than foresting during the time that the Individual Defendants owned it and that the Individual Defendants were not aware of any environmental problems on the Property during the time they owned it. The Plaintiffs dispute this contention based on the fact that in 1989, David Mandelbaum submitted an Application for Farmland Assessment to the State of New Jersey which stated both that the entire Property was used for "fruit crops" and that the entire Property was used for "woodland products." The Defendants argue that the listing of "fruit crops" on the Farmland Assessment was in error and that the Property could not have been used for both fruit crops and woodland products at the same time.[2]

In 1998, at the request of the Department of Planning & Development of the County of Morris (in which Montville Township is located), former defendant Post, Buckley, Schuh & Jernigan, Inc. ("PBS&J"), an environmental consulting firm, performed an environmental assessment of the Property and issued a Phase I Environmental Assessment report, dated April 1998. The report included a review of aerial photographs of the site from various years between 1939 and 1991. The report stated that the Property "was forested in all the photographs viewed" and that the eastern portion "contained rows of trees, indicating that the area may have been a

---

[2] The Plaintiffs also dispute the Woodmont Defendants' contention that the Property was not used as an orchard after 1970 based on an unsigned draft of a 1988 federal tax return for Bonnieview Farms that listed "fruit" as the principal product or service. There is no evidence that this form was anything more than a draft prepared by an outside accountant or that it was ever finalized, signed or filed with the Internal Revenue Service.

tree nursery, while the western portion was naturally occurring forest." (Certification of Stephen Smithson, May 14, 2009 (hereafter, "May 14 Smithson Cert."), Ex. G at 3.) The report revealed that the Property had assorted debris on it, such as tires, wood and metal debris, cement, household debris, abandoned vehicles, hot water heaters, refrigerators, and empty aboveground storage tanks and drums, but did not mention any of the hazardous substances at issue in this case or possible soil contamination. (Id. at 12-14.) The report concluded that "none of the observed debris was considered hazardous, [but] additional material in lower layers could be classified as such." (Id. at 21.) While no sampling was recommended at the time, the report stated that "when the debris is removed, the lower layers should be carefully examined." (Id.)

In 1999, Montville engaged former defendant Princeton Hydro, LLC ("Princeton"), an environmental consulting firm, which provided a report dated May 10, 1999. That report did not mention any discharge of pesticide constituents or other contaminants onto the soil and did not recommend any action with respect to the alleged contaminants.

**B.      Sale of the Property and Construction of the Individual Plaintiffs' Homes**

At some point prior to October 1997, Woodmont Builders entered into an agreement with David Mandelbaum, Nathan Mandelbaum, Ronald Targan and the Estate of Adolph Koralek whereby Woodmont would develop the Property for the construction of single family dwellings houses, the proceeds of the sale of which would be shared by the parties to the agreement. On or around September 24, 1998, the Montville Township Planning Board approved an application to construct a residential subdivision on a 30-acre portion of the Property. On February 10, 1999, Montville acquired an approximately 100-acre portion of the Property from the Individual

Defendants for use as "open space" (hereafter, the "Open Space Parcel").[3]  On June 18, 2000, Woodmont Court acquired the remaining 30-acre portion of the Property (hereafter, the "Residential Lots") from the Individual Defendants and thereafter began construction of a residential subdivision.  The Plaintiffs allege that Woodmont did not conduct any due diligence before acquiring the residential lots.  Mr. Witmondt, however, testified that, in purchasing the Residential Lots, Woodmont Court relied upon the review by PBS&J and the fact that Montville's Board of Health reviewed the lots in connection with the proposed residential development.  (Witmondt Aff., June 3, 2009, ¶ 4.)  After Woodmont Court acquired the Residential Lots, Woodmont Builders developed the land and built single-family homes on the Residential Lots.

After removing surface debris — including tires, abandoned cars, farm trucks, hot water heaters and 50-gallon tanks — from the Residential Lots, to prepare each site on Bonnieview Lane for construction Woodmont Builders then removed the topsoil from the Residential Lots. Woodmont Builders combined and stockpiled the soils, and after the foundations for the homes were dug, and the houses erected, took the topsoil from the stockpile and returned it to the Residential Lots to become the lawns.  Mr. Witmondt testified that the areas on the Residential Lots that were wooded or had wetlands were not disturbed and that, generally, only the areas that later became lawns or had landscaping were disturbed.  During the excavation and regrading process, Woodmont Builders did not test for hazardous substances in the soil that it removed from and subsequently replaced on the Residential Lots.

---

[3] Defendants argue that Montville purchased the Open Space Parcel on July 13, 1999.  It appears from the documents submitted by the parties, however, that Montville acquired approximately 99 acres of the Open Space Parcel, for the sum of $2,200,000, by deed dated February 10, 1999, and

Associated Sales, through its agents, facilitated the sale of the homes on the Residential Lots to the Individual Plaintiffs.  Advertisements published on behalf of Woodmont Properties and Associated Sales represented that the homes were built on "natural homesites" and were a "great place to raise children."  Three Individual Plaintiffs testified that Edward Tomback, whom they believed to be an Associated Sales representative, told them that, during the building process, the topsoil at the Residential Lots was replaced with "good soil" or "fresh topsoil."  Mr. Tomback, a licensed real estate agent and broker, testified that he has been with the company he owns, AmeriFirst, Inc. since about 1988, and that he was never employed by Associated Sales but acted as the broker to sell the homes on the Residential Lots.  He also testified that he knows nothing about the nature of topsoil or grading of soil in connection with building homes and would therefore never have discussed the quality of soil with any of the Individual Plaintiffs.

The Individual Plaintiffs purchased their homes on Bonnieview Lane Between January 2001 and October 2002.  The following is a list of the addresses and dates of purchase of the Individual Plaintiffs' homes:

- Renee K. Goodlow and Michael R. Berry purchased 5 Bonnieview Lane on January 8, 2001.

- Rene N. and Stephen J. Hrop purchased 3 Bonnieview Lane on March 31, 2001.

- Parhat and Sema Yasar purchased 17 Bonnieview Lane on August 31, 2001.

- Yuangen Zhu and Qi Liu purchased 9 Bonnieview Lane on September 17, 2001.

- Fazal and Sanyakhan Bari purchased 19 Bonnieview Lane on October 4, 2001.  They resold 19 Bonnieview Lane on July 31, 2007.

- San Chee and George T. Lee purchased 15 Bonnieview Lane on November 26, 2001.

---

another half acre of the Open Space Parcel, for the sum of $1, by deed dated May 25, 1999.

- G. Thomas and Sharon Perrone purchased 11 Bonnieview Lane on January 25, 2002.

- Joseph and Bobbie Intile purchased 33 Bonnieview Lane on May 23, 2002.

- Juan F. and Rafael Hernandez purchased 1 Bonnieview Lane on August 26, 2002.

- Keith Hamilton purchased 6 Bonnieview Lane on August 28, 2002.

- Yi Lu and Bruce Tang purchased 26 Bonnieview Lane on August 28, 2002.

- James and Diane Sadowski purchased 25 Bonnieview Lane on October 16, 2002.

- Daniel and Pauline Roh purchased 27 Bonnieview Lane on October 24, 2002.

- Louise Ann and Bruce Dostal purchased 29 Bonnieview Lane on November 18, 2002.

Prior to purchasing their homes, the Individual Plaintiffs had title searches performed by title insurance companies. The title reports did not mention any possibility of pesticide contamination on the Residential Lots. One Individual Plaintiff, Sharon Perrone, testified that it was "widely known around town" that the Property had been an orchard, but that she did not know that orchards used pesticides in their operation. (Certification of Lee Henig-Elona, May 13, 2009 (hereafter, "May 13 Henig-Elona Cert."), Ex. 14 at 16:22 – 17: 17.)

On July 26, 2001, Montville entered into an agreement with the NJDEP to investigate and remediate the Property. In March 2002, Montville's environmental consultant, Maser Consulting P.A. ("Maser"), conducted soil sampling on the Open Space Parcel. Maser prepared a report of its findings in August 2002; it identified three Areas of Concern ("AOCs"). Sampling results indicated that the Open Space Parcel was contaminated with pesticides and other contaminants in excess of the applicable standards: the Residential Direct Contact Soil Cleanup Criteria ("RDCSCC") of the New Jersey Department of Environmental Protection ("NJDEP"). Maser informed Montville of the pesticide contamination on the Open Space Parcel in a telephone

9

conversation with Montville Township engineer Anthony Barile, and in a follow-up letter dated

September 3, 2002.[4]  That letter stated, in part:

> All of the AOCs listed above were sampled and found to contain contaminants of concern.  Based on the historical aerials, [Maser] believes the 25-lot residential subdivision under construction from which the open space was originally subdivided from [sic] may also have been part of the same orchard and may contain constituents elevated above the RDCSCC.

> The majority of constituents elevated above the RDCSCC are metals and pesticides associated with historic orchard and land use.  [Maser] would recommend applying and obtaining a Letter of No Further Action (NFA) from the NJDEP. . . .

> The Township's Board of Health involvement may be warranted at this time to advise the public regarding contaminated soils at the site and the adjacent subdivision.  Until a NFA is issued for the site, a Public Notice advising of potential hazards at the site may also be warranted to limit public contact with the soils of the site.

> The constituents identified do not present an imminent health hazard to the public.  The majority of the constituents are metals/pesticides . . . [that] do not easily migrate into surface and/or groundwater.  The health issue that is present is related to long-term ingestion of contaminated soils or long-term inhalation of dust originating from the soils.  Long-term exposure to such contaminants is considered to be carcinogenic.

(May 14 Smithson Cert. Ex. T at 3.)  The letter also noted that because the majority of the Open

Space Parcel was forested, the soils were stable and exposure to contaminants was limited.  It

also stated that because Montville "is now aware of the elevated constituents above the RDCSCC

at the site, it may be liable for any future public contact with soils and potential health issues

---

[4] Montville disputed this statement in its Response to Plaintiffs' Statement of Undisputed Material Facts, but failed to allege any facts, or provide any citation to affidavits or other documents submitted in connection with these motions to support the alleged dispute of material fact as required by Local Civil Rule 56.1.  Plaintiffs submitted a copy of the letter to Mr. Barile as an exhibit in support of their motion, and this statement will be considered an undisputed fact.

involved with such contact."  (Id.)

By letter dated April 29, 2003, Montville notified the homeowners on Bonnieview Lane that it had discovered arsenic and levels of insecticides on the 100 acre Open Space Parcel.  By letter dated May 7, 2003, Montville requested permission to test the Individual Plaintiffs' properties for environmental contaminants, reasoning that "to the extent the township's property and your residential property would have been part of the contiguous land formerly operated by Bonnieview Farms," such testing was advised.  By letter dated May 29, 2003, Montville advised the Individual Plaintiffs that the soil tests revealed the presence of arsenic, dieldrin, lead, or DDT, all hazardous substances under federal and New Jersey law, and that Montville had reported the results to the NJDEP as required by law.  Mr. Witmondt testified that he did not know about the pesticide residues until after Montville notified the Individual Plaintiffs in May 2003.  He did know that the Property had been previously used as an apple orchard, and the Plaintiffs argue that the Woodmont Defendants, as experienced developers, therefore should have known that residual pesticides were present on the Residential Lots.  Mr. David Mandelbaum testified he had no knowledge of environmental problems at the Property until after the sale of the Property to Montville.  (May 13 Henig-Elona Cert. Ex. 2, 44:4-9.)

C.      **Contamination of the Property**

The original contamination of the Property by pesticides took place at some point prior to 1970, when the Property was used for agricultural purposes, including as a commercial apple and peach orchard.  At the time when the Property was used as an orchard, the operations included storing fertilizer and insecticides for spraying and applying onto the trees in the orchard.  The parties agree that chemicals and insecticides were stored in drums and other containers at the

11

Property.  There is no dispute that no sampling or testing of the soil on the Property was conducted prior to Maser's soil sampling in March 2002.

In connection with this litigation, Montville hired Robert L. Zelley, Professional Geologist and Principal at Maser, to provide his professional opinion on the source, remedial responses, and extent of contamination at the Property.  In a letter dated November 14, 2008, Mr. Zelley opined that "[t]he historical legal application of a variety of pesticides has resulted in concentrations of arsenic, lead and DDT and its metabolites, and dieldrin above their respective NJDEP human health and ecological standards in the surface soils throughout the area."  (May 13 Henig-Elona Cert. Ex. 7 at 3.)  The Plaintiffs argue, however, that soil sampling indicates that pesticides were spilled or leaked on the Property during its use as an orchard.  To support this contention, Plaintiffs cite to the deposition testimony of Dr. Jorge Berkowitz, who testified that the pesticide concentration in the soil was heterogeneous, not homogeneous, and that such a distribution indicated that "in certain portions of the property something happened that did not happen in other portions of the property.  How that happened, I don't know."  (May 14 Smithson Cert. Ex. HH at 85:14-24.)  Dr. Berkowitz did not agree, however, that pesticides were spilled or leaked.  Plaintiffs also cite to Table 2 in the May 27, 2003 letter from Maser to the NJDEP which provided a Remedial Investigation Workplan on behalf of Montville for the Property.  (Id. Ex. E.)  Again, Table 2 supports the contention that the concentration of soil contamination varied in different areas of the Property, but does not offer any evidence or opinion as to the reason for the heterogeneous distribution of contamination – whether it was caused by spills, leaks, proper application of the pesticides, or some other reason.

It is undisputed that the Defendants did not add pesticides or other hazardous substances

12

to the Residential Lots or Open Space Parcel, but the Plaintiffs claim that, by clearing the topsoil, stockpiling it, then spreading it over the Residential Lots, the Defendants caused the pesticide contamination to be spread "ubiquitously across the Residential Lots" and into areas previously not contaminated, and to be extended from the surface into the subsurface soil.  In the course of this litigation, Plaintiffs hired environmental consultant, Whitestone Associates, Inc. ("Whitestone"), to provide expert opinions regarding the contamination in the Residential Lots. Thomas K. Uzzo, President of Whitestone, and Keith Tockman, Senior Professional Geologist at Whitestone, authored a report, dated September 25, 2008 (hereafter, the "Whitestone Report"), in which they concluded that, "[t]o a reasonable degree of professional certainty, these soil movement and replacement actions spread and worsened the arsenic, lead and organic pesticide contamination by redistributing the contaminants over a greater area and at more expansive depths than typically would be experienced at the pre-development orchard property."  (May 14 Smithson Cert. Ex. D at 14.)

Defendants dispute the Plaintiffs' contention that the earthwork worsened the contamination of the Residential Lots and that it extended contamination from surface into subsurface soils.  Defendants hired Langan Engineering and Environmental Services ("Langan") to respond to the Whitestone Report and to offer further opinions on the issues in this case.  Dr. Jorge H. Berkowitz, Senior Associate at Langan, authored a report, dated January 2009, in which he opined that the soil re-working on the Residential Lots actually improved the condition of the soil because "re-working soils will eliminate 'hot spots' of contamination, lowering and homogenizing the concentration" of contaminants, which has "beneficial human health consequences" because it lowers the "potential dose of contaminants per aliquot of soil."  (May

13

13 Henig-Elona Cert. Ex. 3 at 15-16.)

Dr. Berkowitz compared the concentrations of pesticides in the "blended" areas of the Residential Lots to the soil in the undisturbed orchard on the Open Space Parcel and in the wooded areas of the Individual Plaintiffs' properties.  (Id. at 20.)  Dr. Berkowitz made these comparisons, rather than compare the soil on the Residential Lots before and after the earthwork, because there was no sampling of the soil prior to the earthwork.  (Id.)  He reported that the mean value for arsenic and dieldrin for all of the samples taken in the lawn areas of the Residential Lots was 6.07 mg/kg (or parts per million, "ppm") for arsenic and 0.028 ppm for dieldrin.[5]  (Id.)  For the samples taken from the former orchard on the Open Space Parcel, Dr. Berkowitz reported a mean value of 32.71 ppm for arsenic and a mean value of 0.225 ppm for dieldrin.  (Id.)  In comparing the mean concentrations found in the lawns of the Residential Lots with those in the former orchard on the Open Space Parcel, he calculated that the mean concentration of arsenic on the lawns of the Residential Lots was approximately 19% of that in the Open Space Parcel and the mean concentration of dieldrin on the lawns of the Residential Lots was approximately 12% of that in the Open Space Parcel.  (Id. at 21.)  For the samples taken from the undisturbed wooded areas of the Individual Plaintiffs' properties, Dr. Berkowitz reported a mean value of 14.53 ppm for arsenic and a mean value of 0.123 ppm for dieldrin.  In comparing the mean concentrations found in the lawns of the Residential Lots with those in the undisturbed wooded areas, he reported that the mean concentration of arsenic in the lawns of the Residential Lots was 42% of that in the wooded areas and the mean concentration of dieldrin in the lawns of the Residential Lots was 23% of that found in the wooded areas.  Plaintiffs note, however, that at his

---

[5] The RDCSCC for arsenic is 20 ppm and for dieldrin is 0.042 ppm.

deposition, Dr. Berkowitz testified that the <u>difference</u> between the concentration of dieldrin in the lawn areas of the Residential Lots and in the woodlands was not statistically significant. (Certification of Stephen Smithson, June 4, 2009 (hereafter, "June 4 Smithson Cert."), Ex. HHH at 205:10 – 206:17.)

Dr. Berkowitz concluded that "[i]t is intuitively obvious, and scientifically demonstrated, that excavation and combining of top soil, and other earth moving activities achieved positive results in reducing contamination concentrations per aliquot of soil, thereby reducing public health risk across the development site" and that it did not appear that Woodmont's earth moving activities "in any way worsened site conditions." (May 13 Henig-Elona Cert. Ex. 3 at 22.) Plaintiffs contend that Woodmont Builder's earthworks caused the contamination to be spread ubiquitously across the Residential Lots and extended the contamination from the surface into the subsurface soils, thus exacerbating the contamination.

Six of the Individual Plaintiffs have added pools, driveways or additions to their homes. The following properties on Bonnieview Lane were improved by their owners: 1, 3, and 19 Bonnieview Lane added pools; 6 Bonnieview Lane added a pool and driveway; 17 Bonnieview Lane added a driveway; and 5 Bonnieview Lane added a driveway and an addition to the home. Defendants allege that these improvements worsened contamination. Plaintiffs, relying upon figures from a draft Remedial Investigation Report Addendum/Remedial Action Workplan ("RIRA/RAW"), dated July 2007, prepared by EWMA (June 4 Smithson Cert. Ex. GGG), argue that the Defendants' own consultants do not identify any contamination in the vicinity of the Plaintiffs' improvements except for at 19 Bonnieview Lane. Many of these figures do not even show where the improvements were constructed on the property, and it is therefore not possible

to tell whether there is contamination in that area.  Neither party has submitted evidence regarding what was done with any soil that was disturbed during the construction of these improvements.

**D.**     **Current Levels of Contaminants in the Residential Lots**

The NJDEP residential soil cleanup criteria for arsenic is 20 ppm and 0.042 ppm for dieldrin.  Dr. Berkowitz reported that the mean value for arsenic and dieldrin for all of the samples taken in the lawn areas of the Residential Lots was 6.07 ppm for arsenic and 0.028 ppm for dieldrin.  (May 13 Henig-Elona Cert. Ex. 3 at 20.)  The Defendants argue that these figures demonstrate that the mean levels in disturbed areas of the Residential Lots meet residential standards.

The Plaintiffs, however, contend that the Residential Lots are contaminated with arsenic and dieldrin in excess of the residential standards.  The Plaintiffs rely on a June 4, 2003 summary report authored by Robert L. Zelley and Eric J. Paulistaitis of Maser.  Mr. Zelley and Mr. Paulistaitis report that soil sampling was conducted on each of the Individual Plaintiffs' Residential Lots.  Two samples from each of the Residential Lots were tested:  a composite sample composed of several samples collected throughout that Residential Lot, and "a discrete sample collected from an area judged to have the highest potential for human exposure or an area selected by the property owner."  (May 14 Smithson Cert. Ex. X at 1.)  All samples were collected from the 0 – 6 inch zone below the existing sod/lawn.  (Id.)  Mr. Zelley and Mr. Paulistaitis report that arsenic and dieldrin were present in the majority of samples at levels above the residential standards.  (Id. at 2.)  Arsenic in the discrete samples ranged from 3.7 to 45 ppm, with a mean of 23.03 ppm and a median of 24.50 ppm.  In the composite samples, the

16

arsenic ranged from 18 to 110 ppm with a mean of 33.38 ppm and a median of 28.00 ppm.  (Id.)

The RDCSCC for arsenic is 20 ppm.  Dieldrin in the discrete samples ranged from 0.0095 ppm

to 0.23 ppm, with a mean of 0.084 ppm and a median of 0.074 ppm.  In the composite samples,

the dieldrin ranged from 0.045 to 0.510 ppm, with a mean of 0.127 ppm and a median value of

0.095 ppm.  (Id.)  The RDCSCC for dieldrin is 0.042 ppm.  Based on these results, Mr. Zelley

and Mr. Paulistaitis conclude that "[a]rsenic and dieldrin are present in the surface soils

throughout" the Plaintiffs' neighborhood at levels above the NJDEP RDCSCC.  (Id. at 3.)

The Plaintiffs also argue that Woodmont's September 2007 RIRA/RAW shows that the

levels of arsenic and dieldrin on the Residential Lots exceed the RDCSCC.  (Id. Ex. Y.)  In that

report, Environmental Waste Management Associates ("EWMA") described sampling of soil in

the Residential Lots and the results of testing that soil for arsenic and dieldrin.  While a majority

of the samples did not contain arsenic and dieldrin at levels above the RDCSCC, many of the

samples did contain arsenic and dieldrin at levels above the RDCSCC.  (Id.)  Plaintiffs also point

to the April 2009 Remedial Action Workplan Addendum (RAWA), submitted to the NJDEP by

EWMA on behalf of Woodmont, which proposes the remedial action of blending – specifically,

blending the impacted soils with "clean on-site soils from deeper depths and, if necessary, clean

off-site soils from a virgin source in an effort to reduce contaminant concentrations to below the

NJDEP RDCSCC."  (May 14 Smithson Cert. Ex. XX at 14.)  Defendants argue that Woodmont

Court has entered into a memorandum of agreement with the NJDEP to voluntarily investigate

the Residential Lots and that the Defendants have no legal obligation to perform any

investigation or remediation and that the lots "now overwhelmingly meet" the RDCSCC.

There is no evidence that any of the Individual Plaintiffs have vacated their homes as a

result of the pesticide contamination.  The Plaintiffs argue that some Individual Plaintiffs have tried to sell their homes but have been unsuccessful due to the pesticide contamination, and that those who have sold their homes have done so at a loss due to the contamination, but they do not contest that the Individual Plaintiffs, or the people to whom they sold the homes, continue to live in their homes on Bonnieview Lane.

**E.      Costs Incurred by the Plaintiffs and Stigma Devaluation**

Whitestone has performed a variety of consulting services for the Plaintiffs in connection with the pesticide contamination at the Residential Lots.  Whitestone has analyzed sampling data from the Residential Lots, evaluated alternatives for remediation of the properties, and communicated with the NJDEP regarding the appropriate permanent remedy for the properties. The Plaintiffs claim that the costs of Whitestone's services are response costs, but the Defendants maintain that these costs are not "response costs" as defined by CERCLA and note that the Plaintiffs have not remediated the contamination at their properties.

The Plaintiffs allege that the Individual Plaintiffs have experienced a devaluation of their homes as a result of the stigma attached to environmental contamination.  In support of their contention, the Plaintiffs offer the report, dated September 26, 2008, of Mark Sussman and Joseph Cimiluca, both New Jersey State Certified General Real Estate Appraisers (hereafter, the "Sussman Report").  As stated in the cover letter to the report, the purpose of the assignment undertaken by Mr. Sussman and Mr. Cimiluca was "to estimate the market value of each property in order to determine any diminution in value due to the discovery, in or about May 2003, of pesticide contamination on the soils surrounding [the Individual Plaintiffs'] homes." (May 14 Smithson Cert. Ex. ZZ.)  The report offers an opinion as to the valuation of the homes

18

of the Individual Plaintiffs and the diminution of that value resulting from the soil contamination as of July 11, 2006.  For each of the Individual Plaintiffs' homes except for two, Mr. Sussman and Mr. Cimiluca opined that the stigma damages equaled 10% of the market value if uncontaminated.  For the other two homes they opined that the stigma damages equaled 20% of the market value if uncontaminated.  (Id.)

The Woodmont Defendants dispute that the Plaintiffs have or will suffer any devaluation of their homes due to environmental contamination.[6]  In support of their contention, the Defendants offer the report of Charles E. Blau, Esq., who is a State Licensed Real Estate Appraiser.  As stated in the cover letter to the report, Mr. Blau inspected the Plaintiffs' properties in order to estimate the effect on the market value of the properties "with a 'No Further Action' letter from the New Jersey Department of Environmental Protection after an approved remediation of historic pesticides in the soil."  (Certification of Lee Henig-Elona, June 3, 2009, (hereafter, "June 3 Henig-Elona Cert.) Ex. 26.)  Mr. Blau concluded that there was no effect on the market value of the homes.  (Id.)

On May 4, 2004, the Plaintiffs filed a claim with the Spill Compensation and Control Act Fund.

## II.  DISCUSSION

### A.  Standard of Review for Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For

---

[6] Montville also disputed this statement in its Response to Plaintiffs' Statement of Undisputed Material Facts, but failed to allege any facts, or provide any citation to affidavits or other documents submitted in connection with these motions to support the alleged dispute of material

19

an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.     CERCLA (First, Second & Third Counts of SAC and All Counterclaims)**

---

fact as required by Local Civil Rule 56.1.

Congress enacted CERCLA in 1980 to address the "serious environmental and health risks posed by pollution." United States v. Bestfoods, 524 U.S. 51, 55 (1998). The two provisions of CERCLA at issue in this case, §§ 107 and 113, "allow private parties to recover expenses associated with cleaning up contaminated sites." United States v. Atl. Research Corp., 127 S. Ct. 2331, 2333 (2007). These two provisions provide two "clearly distinct" remedies. Cooper Indus., Inc. v. Aviall Serv., Inc., 543 U.S. 157, 163 (2004). Section 107(a) provides for a right to cost recovery in certain circumstances, whereas § 113 provides for a separate right to contribution in other circumstances. Atl. Research, 127 S. Ct. at 2337. "[A] private party that has itself incurred cleanup costs" may recover those costs under § 107. Id. at 2338. A potentially responsible party (defined below) "with common liability stemming from an action instituted under § 106 or § 107(a)" is entitled to contribution under § 113. Id.

The Plaintiffs have asserted claims against Woodmont and the Individual Defendants under §§ 107 and 113 of CERCLA and the Woodmont Defendants have asserted counterclaims against the Plaintiffs under §§ 107 and 113 of CERCLA.

The Plaintiffs now move for summary judgment that Woodmont Builders is strictly liable for response costs under § 107(a) of CERCLA, and that the Plaintiffs are entitled to a declaratory judgment against Woodmont Builders for future response costs or damages pursuant to § 113(g) of CERCLA. The Woodmont Defendants move for summary judgment dismissing all of the Plaintiffs' claims under CERCLA. The Plaintiffs' claims under CERCLA are: (1) Woodmont and the Individual Defendants are liable under § 107 of CERCLA as owners/operators at the time of disposal of a hazardous substance or as arrangers (Count One); (2) Woodmont and the Individual Defendants are liable under § 113 of CERCLA for contribution for response costs

21

(Count Two); (3) the Plaintiffs are entitled to a declaratory judgment that Woodmont and the

Individual Defendants are liable for future response costs or damages incurred by the Plaintiffs

Count Three).

### i.    Potentially Responsible Parties

CERCLA provides for the apportionment of the cost of cleanup of hazardous waste

among entities generally referred to as potentially responsible parties ("PRPs").  E.I. DuPont

Nemours & Co. v. United States, 508 F.3d 126, 128 (3d Cir. 2007).  Section 107 defines four

categories of PRPs:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).  Woodmont alleges that they are not PRPs and, thus, cannot be held liable

under either § 107 or § 113.

The Plaintiffs allege that Woodmont Court and Woodmont Builders are liable under

§ 107(a)(2) as past owners and operators, respectively, of the Residential Lots during the time of

disposal of hazardous substances.  Woodmont argues that they are not PRPs under § 107(a)(2) because there was no "disposal" during their ownership of the Residential Lots.  It is undisputed that Woodmont did not <u>add</u> any additional pesticides to the soil, so the question is whether a "disposal" occurred when they removed the contaminated soil from the Residential Lots, combined and stockpiled those soils, then spread the soil back on the Residential Lots to create the Individual Plaintiffs' lawns.

CERCLA section 9601(29) adopts the definition of "disposal" from the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), which states:  "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  Woodmont argues that a disposal did not occur when Woodmont Builders moved and replaced the soils on the Residential Lots because "[a] CERCLA disposal requires active conduct resulting in pollution."  (Defs.' Mot. Summ. J. 13 n.6.)  They cite to <u>ABB Industrial Systems, Inc. v. Prime Technology, Inc.</u>, where the Court of Appeals for the Second Circuit held that passive migration of a contaminant in soil did not constitute a "disposal" under CERCLA.  120 F.3d 351, 358-59 (2d Cir. 1997).  The Court of Appeals for the Third Circuit has also held that there is a "strong argument" that, in the context of a "disposal" under CERCLA, the terms "'leaking' and 'spilling' should be read to require affirmative human action."  <u>United States v. CDMG Realty Co.</u>, 96 F.3d 706, 714 (3d Cir. 1996) (holding that the passive migration, or "gradual spreading of contamination" alleged in that case did not constitute a disposal under CERCLA, but declining to address whether a disposal always requires human conduct.)

23

Woodmont Builders, however, was not passive:  it removed contaminated soils, combined and stockpiled them, then re-spread the soils on the Residential Lots.  In CDMG, the Court of Appeals addressed not only the question of whether passive migration constituted a "disposal" under CERCLA, but also whether a party's soil investigation, which "caused the mixing, shifting, and spreading of contaminants" constituted a disposal.  Id. at 718-19.  The Court held that a disposal includes "not only the initial introduction of contaminants onto a property but also the spreading of contaminants due to subsequent activity."  Id. at 719.  "[T]his definition of disposal does not limit disposal to a one-time occurrence—there may be other disposals when hazardous substances are moved, dispersed, or released during landfill excavations and fillings." Id. (quoting Tanglewood E. Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir. 1988) (internal quotations omitted)).  Additionally, "the dispersal of contaminants need not reach a particular threshold in order to constitute a 'disposal.'"  Id.  "There is no exception for de minimis disturbances."  Id.  "The fact that a defendant's dispersal of contaminants is trivial may provide a ground to allocate less liability to that defendant, but it is not a defense to liability."  Id. The Court of Appeals in CDMG was dealing with a situation somewhat different than the one here in that the alleged act of disposal in CDMG consisted of a soil investigation.  Because "CERCLA clearly contemplates that some soil investigation be allowed to examine contaminated property," the Court held that it was "not enough for a plaintiff to show that a soil investigation has caused the spread of contaminants."  Id. at 721.  Rather, in order to prove that a "'disposal' has occurred based on a soil investigation, a plaintiff must also show that the investigation was conducted negligently."  Id.

The Court of Appeals in CDMG cited to two cases from other Courts of Appeals which

addressed similar issues – one from the Ninth Circuit and one from the Fifth Circuit.  In Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp., 976 F.2d 1338 (9th Cir. 1992), a company called Ferry was hired to excavate and grade a portion of land for a proposed housing development.  Id. at 1339.  While excavating the development site, Ferry spread some of the displaced soil, which contained hazardous chemical compounds, over other parts of the property.  Id. at 1339-40.  On appeal from a motion to dismiss, the Ninth Circuit held that the allegations that Ferry had "excavated the tainted soil, moved it away from the excavation site, and spread it over uncontaminated portions of the property" were sufficient to state a claim that Ferry had "disposed" of a hazardous substance under CERCLA.  Id. 1342.  In Tanglewood, developers built a housing subdivision on a site where a wood treatment plant had formerly operated; large amounts of highly-toxic waste accumulated on the site during the time of operation of the wood treatment plant.  849 F.2d at 1571.  During construction of the subdivision, the developers filled in and graded several creosote pools — spreading tainted soil over the entire site.  Id.  The Fifth Circuit held that, under CERCLA, a "disposal" is not limited to a one-time occurrence; "there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings."  Id. at 1573.

     The Court of Appeals for the Eleventh Circuit has also held that CERCLA's definition of "disposal" is not "limited to instances where a hazardous substance is initially introduced into the environment at a facility."  Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1510 (11th Cir. 1996) (citing Kaiser Aluminum, 976 F.2d at 1342).  The Eleventh Circuit held that "CERCLA's definition of 'disposal' should be read broadly to include the subsequent movement and dispersal of hazardous substances within a facility."  Id. (citing Kaiser Aluminum, 976 F.2d

at 1342).  It concluded, "We agree with the Fifth and Ninth circuits, and hold that a 'disposal'

may occur when a party disperses contaminated soil during the course of grading and filling a

construction site."  Id. at 1512.

The Woodmont Defendants argue that the movement of the contaminated soils in this

case was not a "disposal" under CERCLA, and they, therefore, cannot be held liable for it

because the cases in which such liability has been imposed "involved the movement of soil that

had either been visibly contaminated or which had been taken from a dirty property to a clean

one, and the movement worsened the site conditions."  (Defs.' Mot. Summ. J. 20.)  While the

Defendants are correct about the facts of these cases, the holdings in those cases were not limited

to such situations.  Specifically, the Court of Appeals in CDMG held that a "disposal" under

CERCLA "includes not only the initial introduction of contaminants onto a property but also the

spreading of contaminants due to subsequent activity."  96 F.3d 719.  This definition was not

limited by the Court of Appeals, or by the Fifth or Ninth Circuits in Tanglewood and Kaiser,

respectively, to situations where soil that is moved is visibly contaminated or taken from a dirty

property to a clean one and the movement worsened conditions.  Thus, Woodmont Builders'

movement of the contaminated soils on the Residential Lots may be considered a "disposal"

under CERCLA.  Similarly, the movement of soils by the Individual Plaintiffs for various

improvements on their lots (pools, driveways, etc.) may also be considered a disposal under

CERCLA.  Thus, Woodmont Builders (as an operator) and Woodmont Court (as an owner) are

PRPs under § 107(a)(2).  For the same reasons, any of the Individual Plaintiffs who spread

contaminated soils on their properties when they constructed improvements are PRPs under

§ 107(a)(1) or (a)(2).  Similarly, the Individual Defendants may be PRPs under § 107(a)(2), but,

26

as discussed above, there are issues of fact as to the activities that occurred on the Property when the Individual Plaintiffs owned it and whether any of those activities included earthwork or movement of soils.

The Plaintiffs also allege that the Woodmont Defendants are PRPs under § 107(a)(3) as arrangers.  (SAC ¶ 78.)  The Supreme Court recently addressed arranger liability under CERCLA.  The Court explained that, "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  Burlington N. & Santa Fe Ry. Co., 129 S. Ct. 1870, 1879 (2009) (citing United States v. Cello-Foil Products, Inc., 100 F.3d 1227, 1231 (6th Cir. 1996)).  Plaintiffs admit that arranger liability under § 107(a)(3) requires an intent to dispose of hazardous substances. (Pls.' Opp'n Br. 30.)  Here, there is no evidence that Woodmont took intentional steps to dispose of a hazardous substance — because it is undisputed that Woodmont was unaware of the contamination in the soils at the time it developed the Residential Lots — so it cannot be liable as an arranger under § 107(a)(3).[7]

The Plaintiffs also allege that the Individual Defendants are liable under § 107(a)(1) by operation of law pursuant to § 101(35)(C):

> Nothing in this paragraph or in section 9607(b)(3) of this title shall diminish the liability of any previous owner or operator of such facility who would otherwise be liable under this chapter. Notwithstanding this paragraph, if the defendant obtained actual knowledge of the release or threatened release of a hazardous substance at such facility when the defendant owned the real property and then subsequently transferred ownership of the property to

---

[7] Plaintiffs also argue that § 107(a)(4) may provide an additional basis for CERCLA liability against the Woodmont Defendants but admit that whether they are liable under § 107(a)(4) is not properly before the court at this time because Plaintiffs did not allege such in the SAC.  (Pls.' Opp'n Br. 29 n.7.)

27

> another person without disclosing such knowledge, such defendant shall be treated as liable under section 9607(a)(1) of this title and no defense under section 9607(b)(3) of this title shall be available to such defendant.

42 U.S.C. § 9601(35)(C).  The Plaintiffs argue that if the Individual Defendants had "actual knowledge of the release or threatened release of a hazardous substance" at the Property, then they are treated by operation of law as if they were the current owners of the Residential Lots under CERCLA § 107(a)(1).  (Pls.' Opp'n Br. 39.)  They admit, however, that whether the Individual Defendants "did indeed have such knowledge is a genuine issue of material fact." (Id.)  The Plaintiffs are, therefore, correct, that whether the Individual Defendants are liable under § 107(a)(1) by operation of law pursuant to § 101(35)(C) is not appropriate for resolution at this time.

### ii.    CERCLA § 107 (First Count of SAC)

Section 107 of CERCLA "permits recovery of cleanup costs but does not create a right to contribution."  Atl. Research, 127 S. Ct. at 2338.  "A private party may recover under § 107(a) without any establishment of liability to a third party."  Id.  Section 107 allows a PRP to recover only the costs it has "incurred" in cleaning a site.  "When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response," but is instead reimbursing other parties for their costs.  Id.

Section 107 makes PRPs liable for, among other things:

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

28

Id.  § 9607(a)(4)(A)-(B).  Until fairly recently, it was unclear whether a PRP could recover from another PRP under § 107 of CERCLA or whether a PRP was limited to actions under § 113.  The Supreme Court settled that question in Atlantic Research, where it held that PRPs may avail themselves of both CERCLA §§ 107(a) and 113(f).  127 S. Ct. at 2336 ("[T]he plain language of subparagraph (B) [of § 9607(a)(4)] authorizes cost-recovery actions by any private party, including PRPs.").

In order to prove liability under § 107 of CERCLA, a plaintiff must prove:

> 1) that the defendant is a PRP; 2) that hazardous substances were disposed of at a "facility"; 3) that there has been a "release" or "threatened" release of hazardous substances from the facility into the environment; and 4) that the release or threatened release has required or will require the plaintiff to incur "response costs."

N.J. Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103-04 (3d Cir. 1999).  The response costs must be consistent with the national contingency plan.  42 U.S.C. § 9607(a)(4).

First, as discussed above, Woodmont Properties are PRPs because their removal, stockpiling, and re-spreading of contaminated soil on the Residential Lots is considered a "disposal" under CERCLA.  Second, it is not disputed that the Residential Lots are a "facility" under CERCLA and that dieldrin and arsenic are both "hazardous substances" under CERCLA.  CERCLA defines "release" to include "disposing," so there was also a release of hazardous substances.  CDMG, 96 F.3d at 715; 42 U.S.C. § 9601(22).

There is a question, however, regarding the fourth requirement to prove a claim under CERCLA § 107:  whether the release has required or will require the Plaintiffs to incur "response costs."  First, the Woodmont argues that the removal, stockpiling and re-spreading of the contaminated soils (i.e., the "disposal" and "release") did not and will not require the Plaintiffs to

incur response costs because those actions actually improved the condition of the soil.  Second, Woodmont argues that only they, and not the Plaintiffs, have actually incurred response costs.

CERCLA defines the terms "respond" or "response" to mean "remove, removal, remedy, and remedial action" and states that these terms include "enforcement activities related thereto." 42 U.S.C. § 9601(25).  The terms "remove" or "removal" are defined, in relevant part, to mean:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release . . . .

Id. § 9601(23).  The terms "remedy" or "remedial action" are defined, in relevant part, to mean:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers . . . .

Id. § 9601(24).

The Court of Appeals has held that cleaning up contamination is central to the definition of "response costs."  "The heart of these definitions of removal and remedy are directed at containing and cleaning up hazardous releases . . . . [T]herefore[,] . . . necessary costs of response

30

must be necessary to the containment and cleanup of hazardous releases." Redland Soccer Club, Inc. v. Dep't of the Army, 55 F.3d 827, 850 (3d Cir. 1995) (quoting United States v. Hardage, 982 F.2d 1436, 1448 (10th Cir. 1992)) (internal quotation marks omitted).  To prevail, the Plaintiffs must show that their costs were "monies . . . expended to clean up sites or to prevent further releases of hazardous chemicals." Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 294 (3d Cir. 2000)[8] (quoting Redland Soccer Club, 55 F.3d at 850) (further citations omitted); see also Young v. United States, 394 F.3d 858, 863 (10th Cir. 2005) (response cost is only "necessary" if it is "closely tied to the actual cleanup of hazardous releases"); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669-70 (5th Cir. 1989) (explaining that "[t]o justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment").  "[P]rivate parties may not recoup litigation-related expenses in an action to recover response costs pursuant to section 107(a)(4)(B) of CERCLA." Black Horse, 228 F.3d at 294 (citing Key Tronic Corp. v. United States, 511 U.S. 809, 819-20 (1994); Redland Soccer Club, 55 F.3d at 850).

The facts in Black Horse presented the same question as does this case regarding whether a party had incurred "response costs" or simply litigation costs.  There, the Court of Appeals affirmed that the costs for which the parties involved were seeking reimbursement were litigation

---

[8] Plaintiffs argue that the Black Horse decision was "implicitly overruled" by the Court of Appeals because its decision in United States v. E.I. Dupont de Nemours & Co., 432 F.3d 161 (3d Cir. 2005) (en banc), explicitly overruled its prior decision in United States v. Rohm & Haas Co., 2 F.3d 1265 (3d Cir. 1993).  (Pls.' Reply Br. 13.)  The decision in Dupont, however, did not overrule the aspect of Rohm & Hass relied upon by the Court of Appeals in Black Horse.  The decision in Dupont overruled Rohm & Hass only in so far as the Court in Dupont held that "CERCLA § 107 authorizes the United States to recover costs incurred in overseeing private party removal and remedial actions that are not inconsistent with the National Contingency Plan."  432 F.3d at 179.  Whether the United States can make such a recovery was not at issue in

related expenses, not "necessary costs of response." In examining the billing statements that

demonstrated the alleged "response costs," the Court noted that they (1) were for "consulting

fees," (2) covered services rendered from November 1996 to May 1998 when the complaint was

filed in March 1997, and (3) showed a significant charge corresponding to the time period during

which the consultant submitted an expert report in the litigation. Black Horse, 228 F.3d at 294-

95. Finally, the Court also noted:

> [A]s appellants' environmental consultant, ESI's responsibilities were
> limited to reviewing Essex's quarterly reports it submitted to the
> DEP, and to providing appellants with a summary or analysis of
> Essex's progress in completing its remediation and detoxification
> efforts in accordance with the approved Clean-Up Plan. Indeed, ESI
> was not involved in Essex's cleanup effort; it neither performed an
> investigation of the Property nor gathered data for that purpose. In
> our view, the nature of Essex's responsibilities toward its clients as
> described in the record thus confirms that it was retained to assess, for
> litigation purposes, whether Essex was complying with its contractual
> responsibility to cleanup the Property pursuant to the requirements set
> out in the Clean-Up Plan.

Id. at 295.

Here, Plaintiffs argue that they have incurred two forms of "necessary response costs."

(Pls.' Reply Br. 14.) They argue that both of these costs were for services that "pertain to

developing remedial strategies for the Homes." (Id. 16.) First, their counsel participated in

meetings and conferences with the NJDEP "about the investigation and remedial options" at the

Individual Plaintiffs' homes. (Id. 14.) The Plaintiffs allege that these meetings were "wholly

separate from the conduct of the litigation." (Id. 15.) They contend that the costs for these legal

services are necessary response costs because "lawyers' work that is closely tied to the actual

cleanup may constitute a necessary cost of response in and of itself under the terms of

---

Black Horse, nor is it an issue in this case.

§ 107(a)(4)(B)." (Id. citing Key Tronic, 511 U.S. at 819-20.)

Second, the Plaintiffs' environmental consultant, Whitestone, "engaged in activities designed to lead to the clean up of the Homes." (Id.) They argue that those activities were also necessary response costs. Whitestone has analyzed sampling data from the Residential Lots, evaluated alternatives for remediation of the Residential Lots, and communicated with the NJDEP regarding the appropriate permanent remedies for the properties. On September 14, 2007, Whitestone sent a letter to the Plaintiffs regarding its review of the July 2007 RIRA/RAW provided by Woodmont. (See May 14 Smithson Cert. Ex. TT.) On November 16, 2007, Whitestone sent a letter to the Individual Plaintiffs in which it evaluated Woodmont's proposed RAW. (Id.) Whitestone concluded that the RAW was insufficient because the "horizontal delineation of contaminants has not been properly completed, the 'hot spot' remedial plan is too limited, and the post-remedial sampling plan is inadequate." (Id.) On November 21, 2007, counsel for the Plaintiffs sent Whitestone's November 16, 2006 letter to the NJDEP. On June 10, 2008, the NJDEP sent a "Notice of Deficiency" to Woodmont regarding its September 2007 RAW. (Id. Ex. KK.) Many of the deficiencies noted by the NJDEP were the same as those pointed out in Whitestone's November 16, 2007 letter.

Citing the Supreme Court's decision in Key Tronic, the Plaintiffs argue that the work performed by their counsel is the type of lawyers' work that is "closely tied to the actual cleanup" and thus "may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B)." 511 U.S. at 820. The type of work that fell into that category in Key Tronic, however, was identifying other PRPs. Id. The Court explained,

Tracking down other responsible solvent polluters increases the

33

> probability that a cleanup will be effective and get paid for.  Key
> Tronic is therefore quite right to claim that such efforts significantly
> benefited the entire cleanup effort and served a statutory purpose
> apart from the reallocation of costs.  These kinds of activities are
> recoverable costs of response clearly distinguishable from litigation
> expenses. . . .
>
> This reasoning does not extend, however, to the legal services
> performed in connection with the negotiations between Key Tronic
> and the EPA that culminated in the consent decree.  Studies that Key
> Tronic's counsel prepared or supervised during those negotiations
> may indeed have aided the EPA and may also have affected the
> ultimate scope and form of the cleanup.  We nevertheless view such
> work as primarily protecting Key Tronic's interests as a defendant in
> the proceedings that established the extent of its liability.  As such,
> these services do not constitute "necessary costs of response" and are
> not recoverable under CERCLA.

Id. at 820-21.  The Plaintiffs argue that their counsel's discussions and meetings with the NJDEP

were "wholly separate from this conduct of the litigation" and that the NJDEP and Woodmont's

counsel requested that the Plaintiffs' counsel attend these meetings.  Plaintiffs offer no

explanation, however, of how this work was "closely tied to the actual cleanup," as required by

Key Tronic, or how this work was "necessary to the containment and cleanup of hazardous

releases," as required by another case upon which Plaintiffs rely, Redland Soccer Club, 55 F.3d

at 850.[9]

The Defendants are correct that, just as in Black Horse, the Plaintiffs here did not perform

any investigation or remediation but, rather, retained a consultant and lawyers to review work

performed by others and provide expertise in litigation.  The fact that Woodmont's counsel and

---

[9] Plaintiffs also cite to an unpublished decision of the Court of Appeals, Action Manufacturing
Co., Inc. v. Simon Wrecking Co., Inc., 287 Fed. Appx. 171, 176-77 (3d Cir. 2008), which stated
that "[t]he fact that some of the costs were incurred in the evaluation of less costly alternative
remedies does not render such costs unnecessary."  The costs at issue in that case, however, were
in compliance with a consent decree, pursuant to CERCLA § 122, and were thus presumed to be

the NJDEP asked that Plaintiffs' counsel attend a meeting with the NJDEP simply does not make that counsel's work rise to the level of work "necessary to the containment and cleanup of hazardous releases."  And even if Whitestone's comments on Woodmont's RAW somehow affected the NJDEP's response to it (and there is no evidence, only argument, that this is the case), the fact remains that Whitestone only provided comments on the work of others. Additionally, Mr. Uzzo of Whitestone testified that he did not recommend that the Plaintiffs conduct any investigation or remediation of their properties; he did not recommend that they "should step outside of this action and remediate on their own."  (May 13 Henig-Elona Cert. Ex. 8 at 118:5-19.)  Finally, all of the claimed response costs by the Plaintiffs were incurred years after the discovery of the contamination on the property and years after this litigation commenced.  One of the purposes behind CERCLA is to encourage the prompt clean-up of environmental contamination.  See E.I. DuPont de Nemours & Co. v. United States, 508 F.3d 126, 135 (3d Cir. 2007) (CERCLA's broad, remedial purpose is to facilitate prompt cleanup of hazardous waste sites and to shift the costs of environmental response from taxpayers to the parties who benefited from the hazardous wastes that caused the harm).  Allowing the Plaintiffs to claim that their costs in this case were response costs would not further the purposes of CERCLA because there is no evidence that the actions of their consultants or counsel furthered the cleanup of the Residential Lots.

Similarly, there is no evidence that the Plaintiffs will incur response costs.  The evidence submitted by the parties indicates that the Woodmont is working with the NJDEP to finalize a RAW that is acceptable to the NJDEP, which Woodmont will then be bound to implement.  No

response costs in compliance with the national contingency plan.

evidence has been presented to the court that the Plaintiffs will incur any costs when Woodmont implements the RAW.  The Plaintiffs argue that they "may incur future response costs on the order of $5,422,100.00, plus $37,000 per lot for restoration of the homes," but there is simply no evidence that they will incur any costs at all to remediate the soils at the Residential Lots.

Because the Plaintiffs have not incurred response costs under CERCLA, the Woodmont Defendants' motion for summary judgment dismissing Count One of the SAC is granted.

### iii.      CERCLA § 107 (First and Second Counterclaims)

The Woodmont Defendants allege that the Individual Plaintiffs are liable under CERCLA § 107(a)(1) as current owners[10] of the Residential Lots and under § 107(a)(3) as arrangers.  With respect to liability as an arranger, as discussed above, the Supreme Court recently explained that, "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  Burlington Northern, 129 S. Ct. at 1879 (2009) (citing Cello-Foil Prods., Inc., 100 F.3d at 1231).  There is no evidence that the Individual Plaintiffs took steps to intentionally dispose of a hazardous substance at the Residential Lots, so they cannot be liable under § 107(a)(3) as arrangers.

The Plaintiffs assert the "innocent owner" defense to liability under § 107(a)(1). "CERCLA's innocent owner defense encourages prospective property buyers to conduct soil investigations."  CDMG Realty, 96 F.3d at 721.  The innocent owner defense requires, inter alia, that "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened

---

[10] Plaintiffs correctly note that Dr. and Ms. Bari are no longer the owners of 19 Bonnieview Lane, so they cannot be held liable as current owners under CERCLA § 107(a)(1).  The first counterclaim, as it relates to Dr. and Ms. Bari, is therefore dismissed.

release was disposed of on, in, or at the facility." 42 U.S.C. § 9601(35)(A)(i) (emphasis added).

CERCLA provides explicit guidance on how a defendant may establish that it had "no reason to

know" of a prior disposal:

> To establish that the defendant had no reason to know . . . the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

Id. § 9601(35)(B). CERCLA thus contemplates that prospective purchasers "undertake[ ] ... all

appropriate inquiry" and will engage in "appropriate inspection."

The Plaintiffs argue that the purchasers of eight of the Individual Plaintiffs' homes are

statutorily exempt from current owner liability because they satisfied the requirements for the

"bona fide prospective purchaser" defense. (Pls.' Mot. Partial Summ. J. 74, citing 42 U.S.C.

§§ 9601(40)(B)(iii) & 9607(r)(1).) Those Individual Plaintiffs claim that they qualify as "bona

fide prospective purchasers" because they purchased their homes after January 11, 2002, when

the Small Business Liability Relief and Brownfields Revitalization Act amendments to CERCLA

became effective, and they satisfied the requirements for "appropriate inspection." With respect

to the purchase of residential property, all that is required of nongovernmental or noncommercial

purchasers is that they conduct "a facility inspection and title search that reveal no basis for

further investigation." 42 U.S.C. § 9601(40)(B)(iii). It is undisputed that the following

Individual Plaintiffs, who purchased their homes after January 11, 2002, conducted a facility inspection and obtained a title report that revealed no basis for further investigation:  Juan F. and Rafael Hernandez; Keith Hamilton; G. Thomas and Sharon Perrone; James and Diane Sadowski; Yi Lu and Bruce Tang; Daniel and Pauline Roh; Louise Ann and Bruce Dostal; and Joseph and Bobbi Intile.  (May 14 Smithson Cert. Ex. LL.)  The Woodmont Defendants argue that the Plaintiffs also have to prove that they "exercise[d] appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to (i) stop any continuing release; (ii) prevent any threatened future release; and (iii) prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance."  (Defs.' Opp'n Br. 26, quoting 42 U.S.C. § 9601(40)(D).)  This provision, however, only applies if hazardous substances are <u>found</u> at the facility.  The Individual Plaintiffs listed above conducted an inspection and did not find any hazardous substances, so the provisions of 42 U.S.C. § 9601(40)(D) do not apply to them.  Juan F. and Rafael Hernandez; Keith Hamilton; G. Thomas and Sharon Perrone; James and Diane Sadowski; Yi Lu and Bruce Tang; Daniel and Pauline Roh; Louise Ann and Bruce Dostal; and Joseph and Bobbi Intile have, thus, satisfied the requirements for the innocent owner defense.

The remaining Individual Plaintiffs purchased their homes before January 11, 2002, at which time the Plaintiffs admit that "CERCLA was unclear as to the requisite degree of due diligence required under Section 107(b)(3)."  (Pls.' Mot. Summ. J. 74.)  The original due care defense in CERCLA provides that one will not be liable under § 107(a) if the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by:

> an act or omission of a third party . . . if the defendant establishes by a

38

> preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3).  "Due care" is not defined as used in this provision, but the court sees no reason not to adopt the definition of "due care" with regard to residential properties in the 2002 amendment to CERCLA.  Because it is undisputed that the remaining Individual Plaintiffs also conducted a facility inspection and obtained a title report that revealed no basis for further investigation before they purchased their homes, the court finds that they satisfied the due care defense under CERCLA and are therefore not liable under § 107.

The Plaintiffs' motion for summary judgment dismissing the First and Second Counts of the Counterclaim is therefore granted.

### iv.    CERCLA § 113 (Second Count of SAC)

In the Second Count of the SAC, Plaintiffs allege that, if they are adjudged liable under CERCLA § 107(a)(1), the Defendants are liable to them pursuant to CERCLA § 113(f)(1).

Section 113 of CERCLA "authorizes a contribution action to PRPs with common liability stemming from an action instituted under [CERCLA] § 106 or § 107(a)."  Atl. Research, 127 S. Ct. at 2338.  Section 113(f)(1) provides, in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

42 U.S.C. § 9613(f).

Because the claims against the Plaintiffs under CERCLA § 107 are dismissed, the Plaintiffs' claim under CERCLA § 113 is moot.  The Second Count of the SAC is therefore dismissed.

> ### v.        *CERCLA § 113 (Third Count of Counterclaim)*

In the Third Count of the Counterclaim, the Woodmont Defendants make a claim against the Individual Plaintiffs for contribution under CERCLA § 113.  Because the Woodmont Defendants are not liable under CERCLA § 107, their counterclaim against the Plaintiffs under § 113 fails.  The Third Count of the Counterclaim is therefore dismissed.

> ### vi.       *Declaratory Judgment Under CERCLA (Third Count of SAC)*

Plaintiffs' Third Count — for a declaratory judgment under CERCLA § 113(g)(2) — is dependent upon a successful claim under § 107 of CERCLA.  Because Plaintiffs' claim under § 107 is dismissed, the Defendants' motion for summary judgment dismissing Count Three of the SAC is also granted.

## C.    RCRA § 7002 (Fourth Count of SAC)

The Plaintiffs allege in the Fourth Count of the SAC that Woodmont Properties and the Individual Defendants are liable under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996) (citing Chicago v. Envtl. Def. Fund, 511 U.S. 328, 331-332 (1994)).  Unlike CERCLA, RCRA "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." Id.  Rather, RCRA's main

purpose "is to reduce the generation of hazardous waste and to ensure the proper treatment,

storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present

and future threat to human health and the environment.'" Id. (quoting 42 U.S.C. § 6902(b)).  The

United States Environmental Protection Agency has chief responsibility for the implementation

and enforcement of RCRA, but RCRA also contains a provision to permit private citizens to

enforce the law in some circumstances.  Id. at 483-84.  The citizen suit provision does not

provide for a remedy for past cleanup costs but, rather, provides a remedy that "ameliorates

present or obviates the risk of future 'imminent' harms."  Id. at 486.

In order to state a claim under RCRA, a plaintiff must show,

> (1) that the defendant is a person, including, but not limited to, one
> who was or is a generator or transporter of solid or hazardous waste
> or one who was or is an owner or operator of a solid or hazardous
> waste treatment, storage, or disposal facility; (2) that the defendant
> has contributed to or is contributing to the handling, storage,
> treatment, transportation, or disposal of solid or hazardous waste; and
> (3) that the solid or hazardous waste may present an imminent and
> substantial endangerment to health or the environment.

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005)

The Woodmont Defendants make essentially two arguments why summary judgment

should be granted dismissing the Plaintiffs' claim under RCRA.  First, they argue that the

Plaintiffs failed to give the EPA Administrator the required notice 60 days before they filed this

suit.  See 42 U.S.C. § 6972(b)(1).  The Plaintiffs, however, have provided documentation that

they did indeed provide the proper notice.  (See June 4 Smithson Cert. Ex. FFF.)  The Defendants

do not contest the validity of this notice in their reply papers.

Second, the Woodmont Defendants argue that the Plaintiffs have failed to establish that

Woodmont Properties and the Individual Defendants have contributed or are contributing "to the

past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous

waste which may present an imminent and substantial endangerment to health or the

environment."  42 U.S.C. § 6972(a)(1)(B).  They argue both that they have not disposed of

hazardous waste and that there is no "imminent and substantial endangerment to health or the

environment."  (Defs.' Mot. Summ. J. 24.)  As discussed supra, Section (II)(B)(ii), the

Woodmont Defendants may have "disposed" of hazardous waste as defined under CERCLA.

Because CERCLA adopts the definition of "disposal" and "hazardous waste" used in RCRA, see

42 U.S.C. §§ 9601(29) and 6903, the Woodmont Defendants may also have disposed of

hazardous waste under RCRA.  However, because there is an issue of material fact at least as to

whether there is an "imminent and substantial endangerment to health or the environment,"

summary judgment is not appropriate on this count.

      In order to prove that waste "may present an imminent and substantial endangerment to

health or the environment,"

> [P]laintiffs need only demonstrate that the waste . . . "may present" an
> imminent and substantial threat. . . .   Similarly, the term
> "endangerment" means a threatened or potential harm, and does not
> require proof of actual harm. . . .   The endangerment must also be
> "imminent" [meaning] threatens to occur immediately. . . .   Because
> the operative word is "may," however, the plaintiffs must [only] show
> that there is a potential for an imminent threat of serious harm . . . [as]
> an endangerment is substantial if it is "serious" . . . to the
> environment or health.

Interfaith Cmty. Org., 399 F.3d at 258.  "RCRA's 'substantial' requirement does not require

quantification of the endangerment (e.g., proof that a certain number of persons will be

exposed . . . or that a water supply will be contaminated to a specific degree."  Id. (quoting

United States v. Union Corp., 259 F. Supp. 2d 356, 399-400 (E.D. Pa. 2003) (internal quotation

marks omitted)).  Rather, "an endangerment is 'substantial' if it is 'serious,'" id. (quoting Cox,

256 F.3d at 300 (internal quotations marks omitted)) or "if there is some reasonable cause for

concern that someone or something may be exposed to a risk of harm . . . if remedial action is not

taken."  Id. (quoting Union Corp., 259 F. Supp. 2d at 400 (internal quotation marks omitted)).

 There is a question of fact as to whether the contaminated soils at the Residential Lots

may present a substantial endangerment.  In its September 2007 report prepared for Woodmont

Court, EWMA described sampling of soil in the Residential Lots and the results of testing that

soil for arsenic and dieldrin.  Many of the samples did contain arsenic and dieldrin at levels

above the RDCSCC, but a majority of the samples did not contain arsenic and dieldrin at levels

above the RDCSCC.  (May 14 Smithson Cert. Ex. Y.)  In their June 4, 2003 letter, Mr. Zelley

and Mr. Paulistaitis of Maser conclude that "[a]rsenic and dieldrin are present in the surface soils

throughout" the Plaintiffs' neighborhood at levels above the NJDEP RDCSCC.  (Id. Ex. X at 3.)

While it seems undisputed that at least some of the samples exceed the RDCSCC for arsenic and

dieldrin, it is unclear whether this situation may present a serious endangerment.  There is no

testimony from any experts regarding whether the soil contamination at the Residential Lots may

present a serious threat.[11]  Indeed, the Plaintiffs' consultant, Mr. Uzzo of Whitestone, did not

offer such an opinion and did not even recommend that the Plaintiffs undertake any investigation

or remediation of the soils at the Residential Lots other than to pursue this litigation.  (May 13

Henig-Elona Cert. Ex. 8 at 118:5-19.)  Additionally, the fact that, in the six years since they

---

[11] The Plaintiffs argue that the chemicals at issue are known to cause various cancers and damage
to the brain and nervous systems of children, but they offer no evidence – expert opinion or
otherwise – that  the soil conditions specifically at the Residential Lots pose such a danger.

learned of the contamination, none of the Plaintiffs have undertaken to remediate the

contaminated soils on their own or moved away due to their perception of the danger weighs

against their argument that they believe there is an <u>imminent</u> and <u>substantial</u> endangerment to

their health or the environment.[12]

The Woodmont Defendants' motion for summary judgment and the Plaintiffs' motion for

partial summary judgment on the Fourth Count of the SAC are denied.

**D.      The Spill Act (Fifth Count of SAC)**

The Spill Act is the New Jersey analog to CERCLA.  <u>SC Holdings, Inc. v. A.A.A. Realty</u>

<u>Co.</u>, 935 F. Supp. 1354, 1365 (D.N.J. 1996).  Like CERCLA, the Spill Act is a strict liability

statute that prohibits the discharge of hazardous substances and provides for the remediation of

spills.  <u>Id.</u>  The Spill Act provides for two causes of action: one to recover clean-up costs from

dischargers (contribution claim), N.J. Stat. Ann. 58:10-23.11f(a)(2), and one to recover damages

from the NJDEP, or Spill Compensation Fund, N.J. Stat. Ann. 58:10-23.11k.

The Plaintiffs have made a claim to recover from the Spill Fund (separate from this

litigation) and, here, make a claim under the Spill Act against Woodmont and the Individual

---

[12] In support of their argument on this count, the Plaintiffs also provide certifications regarding
the actions of certain Individual Plaintiffs.  (Pls.' Opp'n Br. 46.)  First, Mr. and Mrs. Berry at 5
Bonnieview Lane attempted to sell their home in the spring of 2006.  It seemed to them that once
potential buyers learned about the pesticide contamination in the soils, they would lose interest in
the home.  Even if this were an undisputed fact, the fact that buyers seemed to lose interest in the
home after they learned of the pesticide contamination is not evidence that there was "an
imminent and substantial endangerment to health or the environment."  There is no suggestion
that these buyers are experts in health or environmental fields, and their loss of interest is not
evidence of an imminent and substantial endangerment.  Similarly, the decisions of Mr. Perrone
at 11 Bonnieview Lane and Mr. Lee at 15 Bonnieview Lane not to use their yards or to wear a
surgical mask while cutting the grass are not evidence that there is an imminent and substantial
endangerment to health or the environment because Mr. Perrone and Mr. Lee do not have any
expertise upon which to base such an opinion.  No other Plaintiffs presented testimony or other

Defendants.  The provision of the Spill Act relating to recovery from dischargers states:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of P.L.1976, c. 141 (C.58:10-23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of P.L.1976, c. 141 (C.58:10-23.11g).

N.J. Stat. Ann. 58:10-23.11f(a)(2)(a).  In the Fifth Count of the SAC, the Plaintiffs claim that

they are entitled to recover costs against Woodmont and the Individual Defendants under N.J.

Stat. Ann. 58:10-23.11g(c)(1).  That portion of the Spill Act provides that "any person who has

discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall

be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs

no matter by whom incurred."

The Spill Act defines "cleanup and removal costs," in relevant part, as

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property. . . .

N.J. Stat. Ann. 58:10-23.11b.  The Spill Act does not authorize "damages arising from emotional

distress, enhanced risk of disease, loss of enjoyment of property, and other economic and

---

evidence that they have reduced the use of their yards due to the contamination.

financial harm." Bahrle v. Exxon Corp., 145 N.J. 144, 155 (1996).

As explained above in the context of the Plaintiffs' claims under CERCLA, the Plaintiffs

have not incurred any cleanup or removal costs related to the contamination in the soil at the

Residential Lots. Rather, they have incurred costs only for litigation related expenses. The Spill

Act defines "cleanup and removal costs" to include both "direct costs associated with a

discharge" and "indirect costs" imposed by the NJDEP. The Plaintiffs have not conducted any

cleanup or paid for cleanup, so they have not incurred "direct costs." Were the Plaintiffs to argue

that they have incurred "indirect costs" under the Spill Act, this argument would fail because, in

order for a private party to obtain reimbursement for such costs, he must obtain written approval

from the NJDEP for these costs and the Plaintiffs have not done so. N.J. Stat. Ann. 58:10-

23.11b; see, e.g., Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 867 (D.N.J.

2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP

and thus are recoverable under the Spill Act.").

The Woodmont Defendants' motion for summary judgment dismissing the Fifth Count of

the SAC is granted.

**E.      New Jersey Consumer Fraud Act (Sixth Count of SAC)**

The NJCFA makes it unlawful for "any person"[13] to use an "unconscionable commercial

practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing

concealment, suppression, or omission of any material fact . . . in connection with the sale or

advertisement of any merchandise or real estate." N.J. Stat. Ann. § 56:8-2. The NJCFA

---

[13] Under the NJCFA, the term "person" includes any "partnership, corporation, company, trust, business entity or association . . ." N.J. Stat. Ann. § 56:8-1. Under the NJCFA, Woodmont Court, Woodmont Builders and Associated Sales qualify as "persons."

"provides a remedy for any consumer who has suffered an 'ascertainable loss of moneys or property, real or personal, as a result of [a violation of the NJCFA],' including treble damages, costs, and attorneys fees." Lee v. First Union Nat'l Bank, 199 N.J. 251, 257 (2009) (quoting N.J. Stat. Ann. § 56:8-19). Because the NJCFA is remedial legislation, its provisions "should be construed liberally in favor of consumers." Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994). "To constitute consumer fraud . . . the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer . . . ." Dabush v. Mercedes-Benz USA, LLC, 378 N.J. Super. 105, 115 (App. Div. 2005) (citing N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 13 (App. Div. 2003)). To state a claim under the NJCFA, a plaintiff must allege "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009) (citation omitted).

In order to state a claim under the NJCFA, the Plaintiffs must first allege unlawful conduct. The NJCFA "sets forth three general categories of unlawful acts: (1) affirmative acts; (2) knowing omissions; and (3) regulatory violations." Bosland v. Warnock Dodge, Inc., 396 N.J. Super. 267, 272 (App. Div. 2007) (citing Cox, 138 N.J. at 17). "The prohibited affirmative acts do not require proof of intent to mislead." Vagias v. Woodmont Properties, L.L.C., 384 N.J. Super. 129, 133 (App. Div. 2006). "One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605 (1997) (citations omitted). "On the other hand, the [NJCFA] specifically provides that acts of omission must be 'knowing'

and committed with 'intent' to induce reliance." <u>Vagias</u>, 384 N.J. Super at 134 (citing N.J. Stat. Ann. § 56:8-2).

The Plaintiffs allege that the Woodmont Properties and Associated Sales violated the NJCFA in two ways.  (Pls.' Reply Br. 19.)  First, they made oral representations to the Individual Plaintiffs that the soils at the Residential Lots would be "good topsoil" although they made no effort to determine the actual conditions of the topsoil.  (<u>Id.</u>)  Second, they published advertisements that the Residential Lots were "natural homesites" in a "great place to raise children."  (<u>Id.</u>)  Both of these allegedly unlawful acts are "affirmative acts" that do not require proof of intent to mislead.  The Plaintiffs do not allege any unlawful omissions on the part of the Defendants.

### i.     *Mr. Tomback's Alleged Misrepresentation*

In support of their argument regarding the oral representations that the Residential Lots had "good topsoil," the Plaintiffs submitted the certifications of three plaintiffs:  Sharon Perrone, Daniel Roh and James Sadowski.  Each of these plaintiffs stated that they spoke with Edward Tomback prior to purchasing their homes on Bonnieview Lane.  Ms. Perrone stated that Mr. Tomback represented to her that, during the development of the Residential Lots, the topsoil had been removed and replaced with "fresh topsoil."  (May 13, 2009 Certification of Sharon Perrone ¶ 2.)  Mr. Roh stated that Mr. Tomback made the same representation to him but used the term "good soil."  (May 14, 2009 Certification of Daniel Roh ¶ 2.)  Mr. Sadowski stated that Mr. Tomback represented to him that during the development process at the Residential Lots Woodmont would replace the topsoil.  (May 12, 2009 Certification of James Sadowski ¶ 2.) There is no evidence that any of the other Individual Plaintiffs received these representations

regarding the "good topsoil," and there is no evidence to show the required causal relationship between this alleged misrepresentation and a loss on the part of the those Individual Plaintiffs who did not receive the misrepresentation.  This claim of a misrepresentation under the NJCFA is therefore limited to the three plaintiffs who allege to have received the misrepresentation.

The Woodmont Defendants make three arguments regarding this claim under the NJCFA. First, they argue that this claim would be properly asserted only against Mr. Tomback, who is not a party to this litigation.  Mr. Tomback testified that he was never employed by Associated Sales but acted as the broker to sell the homes on the Residential Lots.  The Plaintiffs argue that Mr. Tomback was the agent of Woodmont Properties and Associated Sales.  The Supreme Court of New Jersey has held that real estate brokers, agents and salespersons representing professional sellers of real estate are subject to the provisions of the NJCFA.  Strawn v. Canuso, 140 N.J. 43, 60 (1995) superseded by statute on other grounds, L. 1995, c. 253 (codified at N.J. Stat. Ann. 46:3C-10)).  Additionally, under the NJCFA, the term "person" includes "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof[.]"  N.J. Stat. Ann. 56:8-1(d) (emphasis added).  A real estate broker acts as the owner's agent in the sale of a home.  Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 440 (1993) (citing Ellsworth Dobbs v. Johnson, 50 N.J. 528 (1967) (other citations omitted)).  Thus, the Defendants may be held liable under the NJCFA for the actions of Mr. Tomback, their agent.  See Gardner v. Rosecliff Realty Co., 41 N.J. Super. 1, 9 (App. Div. 1956) ("[A] principal may be held, in an action of deceit, for damages resulting from his agent's fraudulent representation, where the principal has put the agent in such a position that a person of

ordinary prudence, conversant with business uses, would be justified in presuming that the agent has the authority to make the representation."); Restatement (Third) of Agency § 7.03 (2006).

Second, the Woodmont Defendants argue that in his deposition, Mr. Tomback denied ever making any representations about the topsoil to the Plaintiffs. He testified that he knows nothing about the nature of topsoil or grading of soil in connection with building homes and would therefore never have discussed the quality of soil with any of the Individual Plaintiffs. The testimony of Mr. Tomback directly contradicts the sworn statements of Sharon Perrone, Daniel Roh and James Sadowski. Thus, it is disputed whether Mr. Tomback actually made the alleged misrepresentations. Because the court will not make determinations of credibility in the context of a motion for summary judgment, there is an issue of material fact preventing summary judgment on this claim.

Third, the Defendants argue that, even if Mr. Tomback used the words that Plaintiffs allege, "these statements are not affirmative representations that could be deemed to have violated the [NJCFA]." (Defs.' Opp'n Br. 22.) They argue that the misrepresentation must be "material to the transaction," and "a statement of fact, found to be false, made to induce the buyer to make the purchase." (Id., quoting Gennari, 148 N.J. at 607 (internal quotation marks omitted).) Again, given the conflicting testimony between Mr. Tomback and the three plaintiffs, there are issues of fact as to whether these statements were made to induce those plaintiffs to purchase their homes and whether these alleged misrepresentations were "material to the transaction." Therefore, summary judgment on Ms. Perrone's, Mr. Roh's and Mr. Sadowski's claims under the NJCFA based on the alleged misrepresentation by Mr. Tomback is not appropriate. The remaining plaintiffs have presented no evidence regarding their claims under

50

the NJCFA based on the alleged misrepresentation by Mr. Tomback, so their claims are
dismissed.

### ii.      The Alleged Misrepresentations in the Print Ads

It is undisputed that Woodmont Properties and Associated Sales published
advertisements stating that the Residential Lots were on a "natural homesite" and were a "great
place to raise children."  The Plaintiffs allege that these advertisements were affirmative
misrepresentations in violation of the NJCFA.  In support of their argument, the Plaintiffs
submitted the certifications of eight of the Individual Plaintiffs:  Sharon Perrone, Daniel Roh,
James Sadowski, Stephen Hrop, Joseph Intile, Fazal Bari, Yuangen Zhu, and Michael Berry.  All
eight certify that, prior to purchasing their homes on Bonnieview Lane, they viewed
advertisements that represented that the homes were built on "natural homesites," and that they
relied upon these statements in deciding to purchase their homes.  There is no evidence that any
of the other Individual Plaintiffs received these representations regarding the "natural homesites,"
and there is no evidence to show the required causal relationship between this alleged
misrepresentation and a loss on the part of the those Individual Plaintiffs who did not receive the
misrepresentation.  This claim of a misrepresentation under the NJCFA is therefore limited to the
eight plaintiffs who allege to have received the misrepresentation.  Mr. Roh and Mr. Intile also
saw advertisements which described Montville as "[a] great place to raise children," with "an
acclaimed school system, a wonderful recreation program, [and] exceptional town services."[14]
They also certified that they relied on these advertisements in deciding to purchase their homes.

---

[14] There is no allegation that the statement that Montville has "an acclaimed school system, a
wonderful recreation program, [and] exceptional town services" is untrue or misleading in any
way, so it will not be further discussed in the context of these claims under the NJCFA or for

Again, because there is no evidence that any of the other Individual Plaintiffs saw the advertisements stating that Montville was "a great place to raise children," this claim of a misrepresentation under the NJCFA is limited to Mr. Roh and Mr. Intile.

The Plaintiffs argue that Woodmont Properties and Associated Sales made the misrepresentations that the Residential Lots were "natural homesites" and "a great place to raise children" despite the fact that they had not tested the topsoil.  (Pls.' Mot. Summ. J. 63-64.)  The Woodmont Defendants respond that these print ads were "harmless puffery," and not misrepresentations at all because they are true.

The NJCFA distinguishes between actionable misrepresentations of fact and "puffery." Rodio v. Smith, 123 N.J. 345, 352 (1991) (the slogan "You're in good hands with Allstate" was "nothing more than puffery" and was thus not "a deception, false promise, misrepresentation, or any other unlawful practice within the ambit of the Consumer Fraud Act").  For example, in Schering-Plough, where the central contention of the plaintiffs was that statements in the defendant's advertisements, such as "you . . . can lead a normal nearly symptom-free life again," were "intended to be understood by consumers as a guarantee of total and universal effectiveness of the product," the court held that this and similar statements were "not statements of fact, but [were] merely expressions in the nature of puffery and thus are not actionable."  367 N.J. Super. at 13-14; see also Daibo v. Kirsch, 316 N.J. Super. 580, 589 (App. Div. 1998) ("Representations by a seller as to the value of his property are not usually a basis for a claim of fraud . . . . Value is a matter of opinion.") (quoting Garden Realty Corp. v. Hadley, 110 N.J. Eq. 475-76 (E. & A. 1932) (internal quotations omitted)); Bouno Sales, Inc. v. Chrysler Motors Corp., 363 F.2d 43, 56

---

fraudulent misrepresentation.

(3d Cir. 1966) ("use of the term 'best qualified' was merely puffing"); Haskell v. Time, Inc., 857 F. Supp. 1392, 1399 (E.D. Cal. 1994) ("Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery.  The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.")

While it seems that the statement that the Residential Lots were "natural homesites" and "a good place to raise children" may in fact be true, in any event they are "idle comments or mere puffery" that are not actionable under the NJCFA.  See Gennari, 148 N.J. at 607.  A review of four cases cited by the Plaintiffs, and the alleged misrepresentations in those cases, demonstrates the type of statements that are and are not actionable as misrepresentations under the NJCFA. First, in Gennari, the defendant made the following misrepresentations:  that the builder was an experienced builder who had built hundreds of quality homes throughout New Jersey when, in fact, he had always worked under the supervision of others and his workmanship was "disastrous."  Id. at 592.  These were actionable misrepresentations under the NJCFA.  Id. at 606-07.  Second, in Vagias, on appeal from a grant of a motion to dismiss, the court found that the plaintiffs had stated a claim under the NJCFA where they were told that a home was located in a certain township, when, in fact, it was not.  384 N.J. Super. at 134-35.  Third, in Leon v. Rite Aid Corp., 340 N.J. Super. 462 (App. Div. 2001), on appeal from the grant of a motion to dismiss, the court found that the plaintiff had stated a claim under the NJCFA where the complaint alleged that the defendant had (1) "prominently advertised that it had 'the lowest and best prices' on pharmaceuticals;" (2) "actively promoted a best-price guarantee, whereby it would 'meet or beat' competitors' prescription prices;" and (3) "intentionally sought to, and did, deceive its pharmacy

customers into believing that they would be provided Rite Aid's best available price when, in fact, they were charged prices well in excess of Rite Aid's stated retail price."  Id. at 466-67. And fourth, in Lingar v. Live-In Companions, Inc., 300 N.J. Super. 22, 26 (App. Div. 1997), a brochure from the defendant "represented that its 'reliable employees' would 'assist with washing, dressing and helping individuals as needed' and would 'provide friendship [and] someone to talk to and be there' when the primary care-giver could not."  The brochure further represented that "'[a]ll employees [were] supervised and a close relationship [was] maintained between [the] employees, clients, client's families, and [Defendant's] administration.'"  Id.  The defendant's employee, however, abandoned the individual for whom he was hired to care and stole several items from his home.  Id.  The Appellate Division held that the plaintiff had stated a claim under the NJCFA because the statements in the brochure "were susceptible of personal knowledge" and "could reasonably have been perceived as declarations of fact."  Id. at 29 (citing Joseph J. Murphy Realty, Inc. v. Shervan, 159 N.J. Super. 546, 551 (App. Div. 1978)).

In contrast to the misrepresentations in the cases discussed above – which are all specific and fairly detailed statements – the statements that the Residential Lots were on "natural homesites" and that Montville was "a great place to raise children" are vague and too general to be "reasonably perceived as declarations of fact."  Therefore, the Plaintiffs' claim under the NJCFA based on the alleged misrepresentations in the print advertisements fails.  The Plaintiffs' claims under the NJCFA related to the statements that the Residential Lots were on "natural homesites" and that Montville was "a great place to raise children" are therefore dismissed.

**F.     Contract Claims (Seventh & Eighth Counts of SAC)**

Plaintiffs allege two contract claims against Woodmont Properties:  breach of contract and breach of the implied covenant of good faith and fair dealing.

**i.     Breach of Contract (Seventh Count of SAC)**

To prevail on a breach of contract claim under New Jersey law, a plaintiff must prove four elements:  "(1) a valid contract existed between plaintiff and defendant; (2) plaintiff breached the contract; (3) defendant performed its obligations under the contract; and (4) defendant was damaged as a result of the breach."  Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp. 2d 543, 566 (D.N.J. 2003) (citing Coyle v. Englander's, 199 N.J. Super. 212, 223 (App. Div. 1985)).

It is undisputed that valid contracts existed between the Individual Plaintiffs and Woodmont Court.  Plaintiffs allege that Woodmont Properties breached the following provision of those contracts of sale between Woodmont Court and the Individual Plaintiffs:  "The Seller will build the house in a good and workmanlike manner and will provide good and proper materials for the construction of the house in accordance with the plans and specifications."  (Pls.' Opp'n Br. 65, citing June 4 Smithson Cert. Ex. LLL at 10 ¶ 12.1.)[15]  Plaintiffs argue that "[d]espite this obligation, the Woodmont Defendants built the Homes on property contaminated

---

[15] The Plaintiffs also argue in their opposition brief that Woodmont Court also breached "express representations" made to the Individual Plaintiffs when it told them that it would strip the topsoil, grade the Residential Lots and restore the lots with fresh topsoil.  The alleged representations were made orally and are not appropriately considered in a claim for breach of contract where, as here, there was a written contract which states that it "is the entire and only agreement between the Buyers and Seller" and that it can be changed only "by an agreement in writing signed by both the Buyers and Seller."  (**Error! Main Document Only.**June 4 Smithson Cert. Ex. LLL at 15 ¶ 30.0)  These representations are properly considered in the context of the Plaintiffs' claims of fraud and misrepresentation.

with dieldrin and arsenic in excess of the RDCSCC," and therefore did not construct the homes in a "good and workmanlike manner" or provide "good and proper materials for the construction" of the Homes.  (Id.)

Contracts should be construed according to the plain and ordinary meaning of their terms. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted).  Thus, the court must give force to the intent of the parties by interpreting the contracts of sale according to the plain meaning of their terms. Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate. Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999).  To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning." Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted).  If the meaning of a contract is ambiguous, it is not subject to summary judgment.

Here, the question is whether the terms "good and workmanlike manner" and provide "good and proper materials for the construction" of the Homes are subject to more than one reasonable interpretation.  The Plaintiffs seem to allege that the term "materials for the construction" must be read to include the soils on which a house is built.  When these terms are read in the context of the contract, there is only one reasonable interpretation.  The sentences which use these terms read:

> The Seller will build the house in a good and workmanlike manner and will provide good and proper materials for the construction of the house in accordance with the plans and specifications. The Seller has a right to substitute materials of equal or better quality than those provided in the plans and specifications or as shown in a Model house.

(June 4 Sellinger Cert. Ex. LLL at 10 ¶ 12.1.) When these sentences are read together, interpreting the term "materials" to include the soil upon which the house is built is not a reasonable interpretation. There is no evidence that the quality of the soil was "provided in the plans and specifications" or "shown in a Model house," so it would not fall into the category of "materials" as used in this paragraph of the contract. Therefore, this provision of the sales contract was not breached by any allegedly contaminated soils. Because the Plaintiffs have identified no other express provisions of the contract that were breached, their claim for breach of contract is dismissed. The Seventh Count of the SAC is dismissed.

### ii. *Breach of the Covenant of Good Faith & Fair Dealing (Eighth Count of SAC)*

The Supreme Court of New Jersey has consistently held that all contracts contain an implied covenant of good faith and fair dealing. Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005); Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract." Brunswick Hills, 182 N.J. at 224 (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965) (internal quotation marks omitted)). "Good faith conduct is conduct that does not 'violate community standards of decency, fairness or reasonableness.'" Id. (quoting Wilson,

168 N.J. at 245).  Proof of "bad motive or intention" is essential to a cause of action for breach of the covenant of good faith and fair dealing.  Id. at 225.  The party claiming a breach of the covenant "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties."  Id. (quoting 23 Williston on Contracts § 63:22, at 513-14 (4th ed. 2002) (footnotes and internal quotation marks omitted)).  Additionally, "subterfuges and evasions" in the performance of a contract violate the covenant even if the actor believes his conduct is justified.  Id. (citing Restatement (Second) of Contracts § 205 cmt. d).  The covenant of good faith and fair dealing may be breached even though the express terms of the contract are not violated, id. at 226 (citing Sons of Thunder, 148 N.J. at 423), but the covenant cannot override an express term in the contract, Sons of Thunder, 148 N.J. at 419.

Put differently, "[a] party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation."  Black Horse, 228 F.3d at 288.  Thus, a showing of bad faith by the breaching party is the essential element of this claim.  Wilson, 168 N.J. at 251.  A party "may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose."  Brunswick Hills, 182 N.J. at 226 (citing Wilson, 168 N.J. at 251).  As the Supreme Court of New Jersey explained in Wilson, a party does not breach the implied covenant of good faith and fair dealing merely because its decisions disadvantaged another party, and "contract law does not require parties to behave altruistically toward each other."  168 N.J. at 251 (internal quotation marks and citation omitted).  For example, in Brunswick Hills, the plaintiff, a tenant, wished to exercise an option to purchase a

ninety-nine-year lease from the defendant.  182 N.J. at 214.  More than a year in advance of the

deadline to exercise the option, the plaintiff notified the defendant, in writing, of its intent to

purchase the ninety-nine-year lease, but, under the mistaken belief that the purchase price was

not due until the time of closing, did not tender the purchase price.  Id. at 229.  As a result,

execution of the option remained unperfected.  Id.  During the following nineteen-month period,

defendant, through its agents, "engaged in a pattern of evasion, sidestepping every request by

plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to

move forward on closing the ninety-nine-year lease."  Id.  The plaintiff's attorneys reached out to

defendant and its representatives repeatedly in letters and telephone calls regarding exercising the

lease option, but to no avail.  Id.  The plaintiff even averred in an estoppel certificate in support

of the defendant's application for a bank loan that it had "exercised its option to convert lease to

a fully prepaid 99 year lease . . ."  Id.  But the defendant never challenged that formal declaration.

 Rather, as the defendant admitted, it was not in its economic interest to allow the exercise of the

option, so it waited until after the deadline to exercise the option had passed and responded to the

plaintiff that the option had expired.  Id. at 229-30.  The Supreme Court of New Jersey held that

the defendant had breached the covenant of good faith and fair dealing through "a demonstrable

course of conduct [consisting of] a series of evasions and delays, that lulled plaintiff into

believing it had exercised the lease option properly."  Id. at 231.

        The Woodmont Defendants argue that the Plaintiffs do not allege any intentional and

deliberate malice or dishonesty and their claim for breach of the implied covenant of good faith

and fair dealing should therefore be dismissed.  The Plaintiffs contend that Woodmont Properties

breached express representations made to the Individual Plaintiffs regarding the nature of the soil

on the Residential Lots.  (Pls.' Opp'n Br. 67.)  While it is disputed whether representations were made to the Plaintiffs about the nature of the topsoil, the Plaintiffs do not dispute that, at the time of the alleged misrepresentations regarding the nature of the topsoil, the Woodmont Defendants did not know that the soil was contaminated.  (Pls.' Mot. Summ. J. 35.)  Because it did not know the soil was contaminated, Woodmont Properties could not have had the requisite "bad motive or intention" that "is essential to a cause of action for breach of the covenant of good faith and fair dealing."  Brunswick Hills, 182 N.J. at 225.

The motion for summary judgment dismissing the Plaintiffs' claim for breach of the covenant of good faith and fair dealing is granted.  The Eighth Count of the SAC is dismissed.

## G.    Negligence Claims (Ninth, Tenth, & Fifteenth Counts of SAC)

"In order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements:  (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages."  Polzo v. County of Essex, 196 N.J. 569, 584 (2008) (quoting Weinberg v. Dinger, 106 N.J. 469, 484 (1987) (internal quotation marks omitted)).  Thus, the first issue to be addressed is whether Montville owed a duty of care to the Plaintiffs.  Under New Jersey law, "'The question of whether a duty exists is a matter of law properly decided by the court, not the jury.'"  Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 445 (1998) (quoting Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194 (1994)).

In determining whether a duty of care exists, a court's "analysis involves identifying, weighing, and balancing several factors – the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."  Kernan, 154 N.J. at 445 (quoting Carter Lincoln-Mercury, 135 N.J. at 194 (internal

quotation marks omitted)).  "There are three general classes of transactions in which a duty to

disclose arises."  United Jersey Bank v. Kensey, 306 N.J. Super. 540, 551 (App. Div. 1997)

(citing Berman v. Gurwicz, 189 N.J. Super. 89, 93 (Ch. Div. 1981)).  Those three situations are:

(1) a fiduciary relationship such as principal and agent or attorney and client; (2) a situation in

which one or each of the parties enters the transaction expressly has a trust and confidence in the

other or such a trust and confidence is necessarily implied because of the circumstances of the

case, the nature of their dealings, or their position towards each other; (3) contracts or

transactions which are intrinsically fiduciary by nature and necessarily call for perfect good faith

and full disclosure, without regard to the intention of the parties.  Id.

### i.      Negligence - Montville (Fifteenth Count of SAC)

Montville moves for summary judgment dismissing the Plaintiffs' negligence claim

against it.  The Plaintiffs move for partial summary judgment of the same claim.

The Plaintiffs allege that Montville had a duty to take "appropriate and reasonable care to

consider past uses of the Property for agricultural and orchard operations," which resulted in the

contamination of the soils, and to inform the Individual Plaintiffs of such risks and to make such

information available to the general public.  (SAC ¶ 141.)  They also allege that Montville had a

duty "to explain fully the purpose and consequences of its affirmative undertaking of sampling at

the Residential Lots."  (Id. ¶ 142.)  The Plaintiffs allege that Montville breached these duties and

caused them damages.

Montville argues that it did not owe a duty to the Plaintiffs.  Montville argues that the law

of New Jersey does not "impose any affirmative duties upon property owners to disclose to

prospective purchasers of other properties information regarding potential on-site or off-site

environmental matters at or involving the other property," or "impose an affirmative duty upon [a] property owner to test for contaminants at other properties."  (Montville's Mot. Summ. J. 13.)

Plaintiffs do not contest that Montville – as a property owner – did not owe a duty of care to the Plaintiffs.  Rather, they argue that Montville – as a municipality – owed them a duty of care.  They contend that "the relevant issue, which gives rise to Montville's duty, is that Montville is the municipality where the [Individual Plaintiffs] reside."  (Pls.' Opp'n Br. 24.) They contend that "Montville's duty was to notify the [Individual Plaintiffs] of contamination at the Residential Lots when Montville knew, or had reason to know, of the contamination at the Residential Lots."  (Pls.' Opp'n Br. 22.)  The Plaintiffs argue that "it is only fair as a matter of policy to hold the defendant municipality liable to its citizens, when it had information that they were going to be purchasing homes built on contaminated soil, but knowingly chose to withhold that information."  (Pls.' Opp'n Br. 23.)  The Plaintiffs, however, fail to cite any authority which supports this argument.  They cite two cases and one statute, but none of those supports the notion that a court should impose such a duty on a municipality.  They cite N.J. Stat. Ann. 40:48-2, which essentially gives municipalities the power to make laws as it deems necessary for the protection of people and property, for the preservation of public health, and "as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law."[16]  The Plaintiffs failed to note, however, that this statute begins with the permissive phrase,

---

[16] The full text of this statutes states:

> Any municipality may make, amend, repeal and
> enforce such other ordinances, regulations, rules and
> by-laws not contrary to the laws of this state or of the
> United States, as it may deem necessary and proper
> for the good government, order and protection of
> persons and property, and for the preservation of the

"Any municipality may make, amend, repeal . . ." Id. (emphasis added).  Under one of the basic tenets of statutory interpretation – the distinction between permissive and mandatory language – this permissive language does not impose a duty on the municipalities; rather, it grants them the power to make laws that they deem necessary.

The Plaintiffs also cite a phrase from the 1956 decision of the Appellate Division in Priory v. Borough of Manasquan, 39 N.J. Super. 147, 162.  The full sentence, from which the Plaintiffs cited only a short phrase, states, "There is the further consideration that the construction of a comfort station is a proper exercise of the police power of a municipality, one of whose primary duties is to protect the health and safety of its people."  As evident from this sentence, Priory dealt with whether a municipality had the authority to construct a comfort station.  This case does not support the argument that a municipality owes a duty to its residents to notify them of contamination at a property near theirs.

The second case the Plaintiffs cite is the 1979 decision of the Appellate Division in New Jersey v. East Shores, Inc., 164 N.J. Super. 530.  The full sentence in that case, from which the Plaintiffs cited only a short phrase, states, "It has also been said that one of the paramount obligations of a municipality is to furnish its citizens (as far as possible) with a sufficient supply of water, not only for the public health, but for the public safety as well, in order to afford the means of extinguishing fires and preventing conflagrations."  Id. at 539 (citing 13 McQuillin, Municipal Corps. (3 ed. 1971), § 37.04 at 22).  As evident from this sentence, East Shores dealt

---

public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

N.J. Stat. Ann. 40:48-2.

with a municipality's duty to provide water for its residents. Again, this case does not support the argument that a municipality owes a duty to its residents to notify them of contamination at a property near theirs.

The Plaintiffs also argue at length that the warnings that Montville received from its environmental consultants "illustrates [the] duty" Montville had. (Pls.' Mot. Summ. J. 32.) Knowledge, however, does not establish the existence of a duty; rather, such evidence would provide support for the contention that a breach of a duty occurred. First, however, the duty itself must be established. Kernan, 145 N.J. at 445 ("To recover under a negligence theory, it is paramount that a defendant first owe the plaintiff a duty.") (citing Carvalho v. Toll Bros. & Developers, 278 N.J. Super. 451, 457 (App. Div. 1995)). And the Plaintiffs have not established such a duty. The Plaintiffs also cannot establish such a duty based upon the fact that Montville's environmental consultant stated that "liability issues may exist;" Montville's environmental consultant is not a legal expert and was not offering an opinion as to whether Montville had a duty to the Individual Plaintiffs.[17]

The Plaintiffs cite no authority, and the court is unaware of any, that would support the imposition upon a municipality, state or other government of the duty of care which they seek to have imposed upon Montville. Because there is no duty of care, the Plaintiffs negligence claim against Montville fails and Montville's motion for summary judgment dismissing this claim will be granted. The Fifteenth Count of the SAC is dismissed.

---

[17] Similarly, the Plaintiff's statement in a footnote that Montville's duty is proven by the fact that it eventually notified Woodmont and the Plaintiffs of the contamination is without merit. Were the court to hold that every action taken by a party is evidence that the party had a duty to take that an action, it would turn the law of negligence on its head.

*ii.*      *Negligence - Woodmont Properties & Associated Sales (Ninth Count of SAC)*

The Woodmont Defendants move for summary judgment dismissing the Plaintiffs'

negligence claim against Woodmont Properties and Associated Sales.

The Plaintiffs claim that Woodmont Properties and Associated Sales, "as real estate

professionals" owed the Plaintiffs "a duty to take appropriate and reasonable care as is customary

in new home sale transactions to inspect the premises and disclose to the [Plaintiffs] the facts of

previous operations and existence of hazardous substances in the soils at the Residential Lots

prior to selling." (SAC ¶ 118.)  They allege that the Woodmont Defendants knew or should have

known of the contamination at the Residential Lots and breached their duty by failing to disclose

said contamination. (Id. ¶ 119.)

The first issue to be addressed is whether Woodmont Properties and Associated Sales

owed a duty of care to the Plaintiffs.  To determine if a duty exists, a court must balance several

factors: "the relationship of the parties, the nature of the attendant risk, the opportunity and

ability to exercise care, and the public interest in the proposed solution." Kernan, 154 N.J. at 445

(quoting Carter Lincoln-Mercury, 135 N.J. at 194 (internal quotation marks omitted)).  Here, the

transaction between the Plaintiffs and Woodmont Properties and Associate Sales falls into one of

the "general classes of transactions in which a duty to disclose arises." United Jersey Bank, 306

N.J. Super. at 551 (citing Berman, 189 N.J. Super. at 93).  The sale of a home by a developer and

builder to a non-commercial purchaser is a situation in which trust and confidence may

necessarily be implied because of the circumstances of the case, the nature of their dealings, or

their position towards each other. See id.; Nobrega v. Edison Glen Assocs., 327 N.J. Super. 414,

423 (App. Div. 2000) ("sellers who have knowledge of on-site conditions adversely affecting

value [of a home] have the duty of disclosure thereof") (citing <u>Weintraub v. Krobatsch</u>, 64 N.J. 445, 317 A.2d 68 (1974)).

The remaining factors to prove a claim of negligence – a breach of the duty, proximate cause, and actual damages – all present issues of material fact. There is no evidence regarding the details of the duty of care (i.e., industry standards and practices) that Woodmont Properties and Associate Sales owed to the Individual Plaintiffs, whether that duty was breached, and whether the breach was the proximate cause of the Plaintiffs' claimed injuries. Finally, there is an issue of fact relating to the actual damages. The Plaintiffs' expert opined that the value of the Individual Plaintiffs' homes were diminished due to "stigma damages." And the Woodmont Defendant's expert opined that the homes would not suffer from "stigma damages." These are issues to be resolved by a trier of fact. Summary judgment on the Ninth Claim of the SAC is therefore not appropriate.

### iii.    Negligence – Woodmont & the Individual Defendants (Tenth Count of SAC)

In the Tenth Count of the SAC, the Plaintiffs allege that Woodmont and the Individual Defendants owed the Plaintiffs "a duty to take appropriate and reasonable care as is customary in the development, construction and sale of new homes." (SAC ¶ 122.) They allege that Woodmont and the Individual Defendants breached that duty by developing and constructing homes on the Residential Lots when they "knew or should have known of the presence of pesticide contamination resulting from the orchard or agricultural use." (<u>Id.</u> ¶ 123.)

Again, the first issue to resolve is whether Woodmont and the Individual Defendants owed a duty to the Plaintiffs in this situation. This count does not fall into one of the "general classes of transactions in which a duty to disclose arises," as there was no transaction here. <u>See</u>

66

United Jersey Bank, 306 N.J. Super. at 551.  While the Ninth Count of the SAC relates to the

sale of the homes to the Individual Plaintiffs, this count seems to relate to the development of the

Residential Lots – one step removed from the sale to the Individual Plaintiffs.  The Plaintiffs did

not deal directly with the Individual Defendants or with Woodmont in its capacity as developers.

 Rather, as recognized by the allegations of Count Nine, the Individual Plaintiffs dealt directly

with Associated Sales, which facilitated the sales on behalf of Woodmont Properties.  The

Plaintiffs provide no authority which would support the imposition of a duty on developers to

unknown, third parties who might buy the homes in the future.  Because Woodmont and the

Individual Defendants did not owe a duty to the Plaintiffs in this situation, Count Ten of the SAC

is dismissed.

**H.      Misrepresentation Claims (Eleventh & Twelfth Counts of SAC)**

      ***i.       Fraudulent Misrepresentation (Eleventh Count of SAC)***

In the SAC, the Plaintiffs allege that Woodmont Properties and Associated Sales

"purposely concealed prior agricultural operations at the Property which they knew or should

have known could cause contamination" on the Residential Lots.  (SAC ¶ 127.)  They further

allege that this "latent defect" was material to the transaction because it would have affected the

Individual Plaintiffs' decisions to purchase their homes.  (Id. ¶ 128.)  In their brief in opposition

to the Woodmont Defendants' motion for summary judgment, however, the Plaintiffs state that

"[t]he gravamen of the fraudulent misrepresentation claim is not the Woodmont Defendants'

concealment of the former use of the property, but rather the affirmative misrepresentations made

by the Woodmont Defendants to persuade the [Individual Plaintiffs] to purchase their respective

homes."  (Pls.' Opp'n Br. 54.)  The court reads this statement to mean that the Plaintiffs no

longer allege fraudulent misrepresentation through an <u>omission</u> of Woodmont Properties and Associated Sales, but only through an <u>affirmative representation</u>.  Though the Plaintiffs do not explain in the relevant section of their brief exactly what "affirmative misrepresentations" they allege, the court will assume that they allege here the same "affirmative misrepresentations" that they alleged in their claims under the NJCFA discussed <u>supra</u> Section (II)(E).  For the same reasons as discussed in the context of the Plaintiffs' claims under the NJCFA, because a limited number of Individual Plaintiffs have testified that they received the misrepresentations, the claims are, at the outset, limited thusly:  (1) the claim that Mr. Tomback made a fraudulent misrepresentation by stating that the Residential Lots had "good topsoil" is limited to three of the Individual Plaintiffs:  Sharon Perrone, Daniel Roh, and James Sadowski; (2) the claim regarding the misrepresentations in the print ads is limited to eight of the Individual Plaintiffs:  Sharon Perrone, Daniel Roh, James Sadowski, Stephen Hrop, Joseph Intile, Fazal Bari, Yuangen Zhu, and Michael Berry.

The five elements of common law fraud or misrepresentation are:  "(1) a material misrepresentation of the presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resultant damages."  <u>Gennari</u>, 148 N.J. at 610.

### a. Mr. Tomback's Alleged Misrepresentation

One of the elements of a claim for common law misrepresentation is the knowledge or belief by the defendant of the falsity of the representation.  <u>Id.</u>  The Plaintiffs have failed to allege this requisite scienter on the part of Mr. Tomback.  They have presented no evidence, circumstantial or otherwise, that Mr. Tomback knew the soil was contaminated.  The Plaintiffs'

claim for fraudulent misrepresentation based on the alleged misrepresentations of Mr. Tomback is therefore dismissed.

### b.      The Alleged Misrepresentations in the Print Ads

One of the elements of a claim for common law misrepresentation is the reasonable reliance of the plaintiff on the misrepresentation.  Id.  As discussed in the context of the NJCFA, supra Section (II)(E), reliance on the statements that the houses were built on "natural homesites" and were a "good place to raise children" is not reasonable, as these statements are vague and puffery.

The Plaintiffs' claims of fraudulent misrepresentation based on the alleged misrepresentations in the print ads are therefore dismissed.

The Eleventh Count of the SAC is dismissed.

### ii.      *Negligent Misrepresentation (Twelfth Count of SAC)*

The Twelfth Count of the SAC is a claim against Woodmont Properties and Associated Sales for negligent misrepresentation.  In the SAC, the Plaintiffs allege that "[t]he failure of Woodmont Properties and Associated Sales to disclose historical use of environmental contaminants that they knew or should have known resulted in contamination of the [Individual Plaintiffs'] properties constituted a material omission" that would have affected the Individual Plaintiffs' decisions to purchase their homes.  (SAC ¶ 131.)  They further allege that they relied upon "inadequate information, which did not include the facts of historical pesticide use or resulting contamination."  (Id. ¶ 133.)  Again, in their brief in opposition to the Woodmont Defendants' motion for summary judgment, however, the Plaintiffs seem to limit their claims for negligent misrepresentation to affirmative representations rather than any omissions.  (Pls.'

69

Opp'n Br. 57-58.)  The court will again read the Plaintiffs' brief to mean that they no longer

allege negligent misrepresentation through an <u>omission</u> of Woodmont Properties and Associated

Sales, but only through an <u>affirmative representation</u>.  Though the Plaintiffs do not explain in the

relevant section of their brief exactly what "affirmative misrepresentations" they allege, the court

will assume that they allege here the same "affirmative misrepresentations" that they alleged in

their claims under the NJCFA discussed <u>supra</u> Section (II)(E).  For the same reasons as discussed

in the context of the Plaintiffs' claims under the NJCFA, because a limited number of Individual

Plaintiffs have testified that they received the misrepresentations, the claims are, at the outset,

limited thusly:  (1) the claim that Mr. Tomback made a fraudulent misrepresentation by stating

that the Residential Lots had "good topsoil" is limited to three of the Individual Plaintiffs:

Sharon Perrone, Daniel Roh, and James Sadowski; (2) the claim regarding the misrepresentations

in the print ads is limited to eight of the Individual Plaintiffs:  Sharon Perrone, Daniel Roh,

James Sadowski, Stephen Hrop, Joseph Intile, Fazal Bari, Yuangen Zhu, and Michael Berry.

    Just as with the Plaintiffs' claims for negligence, a claim for negligent misrepresentation

"requires the plaintiff to prove that the putative tortfeasor breached a duty of care owed to

plaintiff and that plaintiff suffered damages proximately caused by that breach."  <u>Highlands Ins.</u>

<u>Co. v. Hobbs Group</u>, 373 F.3d 347, 351 (3d Cir. 2004) (citing <u>Weinberg v. Dinger</u>, 106 N.J. 469,

524 A.2d 366, 373 (1987)).  The elements of negligent misrepresentation are essentially the same

as those of common law fraud except negligent misrepresentation does not require scienter.

"Negligent misrepresentation is . . . [a]n incorrect statement, negligently made and justifiably

relied on, [and] may be the basis for recovery of damages for economic loss . . . sustained as a

consequence of that reliance."  <u>Kaufman v. i-Stat Corp.</u>, 165 N.J. 94, 109 (2000) (quoting <u>H.</u>

Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983), superseded by statute on other grounds, (internal quotations omitted)).  To prove a claim of negligent misrepresentation under New Jersey law, the plaintiff must demonstrate that "1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages."  McCall v. Metropolitan Life Ins., 956 F. Supp. 1172, 1186 (D.N.J. 1996).

In Highlands Insurance, the Court of Appeals noted that because "under New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information . . . a defendant may be liable (because it owes a duty) to any foreseeable recipient who relies on the information."  373 F.3d at 351; see Karu v. Feldman, 119 N.J. 135, 148 (1990) ("In other contexts, courts have recognized a cause of action based on negligent misrepresentation when a party fails to provide the correct information at the time when it might affect future actions, where there is a duty to disclose.")  The Court of Appeals acknowledged that an action for negligent misrepresentation under New Jersey law also may be "based on the defendant's silence or suppression of the truth rather than on some affirmative misrepresentation" and in such an instance "is not limited to special relationships such as those involving transactions with explicit fiduciary duties, transactions where a quasifiduciary relationship develops either through the express conduct of the parties or other circumstances particular to that individual transaction or transactions . . . whose nature inherently requires such a duty regardless of the parties' intentions."  Highlands, 373 F.3d at 355 (citing Strawn, 140 N.J.

43, superseded by statute on other grounds, L. 1995, c. 253 (codified at N.J. Stat. Ann. 46:3C-10)).

### a.     Mr. Tomback's Alleged Misrepresentation

The first issue to address is whether Mr. Tomback, as an agent of Woodmont Properties and Associated Sales, owed a duty to the Individual Plaintiffs.  Given that a broker selling homes would reasonably expect persons interested in the homes to rely on his statements regarding those homes, representations made by Mr. Tomback may have created a duty to any foreseeable recipient who relied on the representations.  See Highlands Ins., 373 F.3d at 351.  If Mr. Tomback made the representations as alleged to Sharon Perrone, Daniel Roh, and James Sadowski, then those three would certainly be reasonably reasonably foreseeable recipients of that information.  As discussed in the context of the NJCFA, supra Section (II)(E), however, there are issues of fact as to whether Mr. Tomback made the alleged representations.  Summary judgment on the claims of Sharon Perrone, Daniel Roh, and James Sadowski for negligent misrepresentation based on Mr. Tomback's alleged misrepresentations is, therefore, not appropriate.

### b.     The Alleged Misrepresentations in the Print Ads

A required element for a claim of negligent misrepresentation is that the plaintiff justifiably relied on the misrepresentation.  McCall v. Metropolitan Life Ins., 956 F. Supp. 1172, 1186 (D.N.J. 1996).  As discussed in the context of the NJCFA, supra Section (II)(E), reliance on the statements that the houses were built on "natural homesites" and were a "good place to raise children" is not reasonable, as these statements are vague and puffery.

The Plaintiffs' claims of negligent misrepresentation based on the alleged misrepresentations in the print ads are therefore dismissed.

## I.     Abnormally Dangerous Activity (Thirteenth Count of the SAC)

Plaintiffs allege that Woodmont Properties and the Individual Defendants "directly or indirectly caused the use, generation, disturbance, dispersal, placement and disposal of hazardous substances at the Residential Lots during their ownership of the Residential Lots" and that they are therefore strictly liable for an abnormally dangerous activity.  (SAC ¶ 135.)

"To prevail on a claim for strict liability, two elements must be demonstrated: (1) that the defendant's disposal of waste constituted an 'abnormally dangerous activity,' and (2) that such activity has harmed the plaintiff."  Interfaith Cmty. Org., 263 F. Supp. 2d at 850 (citing T&E Indus. v. Safety Light Corp., 123 N.J. 371, 390 (1991); N.J. Turnpike Auth. v. PPG Indus., Inc., 16 F. Supp. 2d 460, 479 (D.N.J. 1998)).

"The abnormally dangerous activity doctrine is premised on the principle that 'one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of  another resulting from the activity, although he has exercised the utmost care to prevent the harm.'"  Bahrle v. Exxon Corp., 279 N.J. Super. 5, 37 (App. Div. 1995) (quoting T&E Indus., 123 N.J. at 390).  "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it."  Restatement (Second) of Torts § 520 cmt. f.

In determining whether an activity is abnormally dangerous, New Jersey courts have adopted a six-part test.  Courts must consider:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

T & E Indus., 123 N.J. at 390 (citing Restatement (Second) of Torts § 520).  All of the factors are to be considered, and no single factor in § 520 alone is necessarily sufficient for the conclusion that an activity is abnormally dangerous.  Restatement (Second) of Torts § 520 cmt. f.  It is not necessary that each factor be present if the other factors weigh heavily for or against a finding that an activity is abnormally dangerous.  Id.  Ordinarily, a court must find that several factors apply in order to impose strict liability.  Id.

The Plaintiffs have not shown that the activity of the Woodmont Defendants — the movement of contaminated soils and building houses upon the soils — poses a high degree of risk of some harm.  While it is uncontested that the pesticides in the soil at the Residential Lots can be dangerous, and there are samples of the soil where the pesticides are above the RDCSCC, the Plaintiffs have not presented any evidence that the levels of pesticides in the soil at the Residential Lots "pose a high degree of risk of some harm."  Similarly, they have not shown a "likelihood that the harm that results from it will be great."  As discussed above, the Plaintiffs have not proven damages of any sort other than possibly "stigma damages" — which are the subject of a dispute of opinion between the parties' experts.  Further, the Plaintiffs allege, without evidence, that this activity is not a "common" one.  The Woodmont Defendants, however, present evidence that the NJDEP encourages redevelopment of properties that are contaminated, including for housing.  (Defs.' Opp'n Br. 25; June 3 Henig-Elona Cert. Ex. 28.)

Given these considerations, the Woodmont Defendants' activities at the Residential Lots —
removing, stockpiling and re-spreading contaminated soils, and building houses on those soils —
simply do not create "a risk so unusual, either because of its magnitude or because of the
circumstances surrounding it, as to justify the imposition of strict liability for the harm that
results from it." See Restatement (Second) of Torts § 520 cmt. f.

The Woodmont Defendants' motion for summary judgment dismissing the claim of strict
liability for an abnormally dangerous activity is granted. The Thirteenth Count of the SAC is
dismissed.

**J.      Implied Warranty of Habitability (Fourteenth Count)**

Plaintiffs allege that Woodmont Properties breached the implied warranty of habitability
by "failing to disclose prior operations involving historic usage and discharge of hazardous
substances which they knew of should have known caused contamination, and which constitutes
a latent defect of the soils" at the Residential Lots. (SAC ¶ 138.)

"Habitability is synonymous with suitability for living purposes; the home must be
occupiable." Aronsohn v. Mandara, 98 N.J. 92, 104 (1984) (citing Trentacost v. Brussel, 82 N.J.
214, 225 (1980) ("At a minimum, the necessities of a habitable residence include sufficient heat
and ventilation, adequate light, plumbing and sanitation and proper security and maintenance."));
Marini v. Ireland, 56 N.J. 130, 146 (1970) (habitability covers "vital facilities necessary to
maintain premises in a livable condition"). "When a vendee buys a development house from an
advertised model . . . he clearly relies on the skill of the developer and on its implied
representation that the house will be erected in reasonably workmanlike manner and will be
reasonably fit for habitation." McDonald v. Mianecki, 79 N.J. 275, 292 (1979).

The Woodmont Defendants are correct that the Plaintiffs have failed to prove that the soils have made their homes uninhabitable.  None of the Plaintiffs have testified that there is any defect in their homes and only one Plaintiff, Mr. Perrone, has testified that the enjoyment of his yard has been limited.  As discussed <u>supra</u>, n.12, however, there is no suggestion that Mr. Perrone is an expert in health or environmental fields, so his decision to limit his children's use of the yard, with no further evidence, fails to prove that the warranty of habitability has been breached.  There is no evidence that the limited use of his yard was necessary, as the Plaintiffs have presented no expert testimony that use of the yards at the Residential Lots is unsafe. Indeed, one other Plaintiff, Rafael Hernandez, testified that the use of his yards, including playing lots of baseball with his children, did not change at all after he learned of the contamination of the soil.  (May 13 Henig-Elona Cert. Ex. 5 at 36:14-37:2.)

The Woodmont Defendants' motion to dismiss the Plaintiffs' claim of breach of the implied warranty of habitability is granted.  The Fourteenth Count of the SAC is dismissed.

## K.    DEFENDANTS' DEFENSES

The Plaintiffs move to dismiss the Woodmont Defendants' Twelfth Separate Defense. The Woodmont Defendants concede that their Twelfth Defense, based on preemption, pled in their Answer and Counterclaim to the FAC should be dismissed.  In any case, it appears that this defense has been dropped, as it does not appear in the Answer and Counterclaim to the SAC.

The Plaintiffs move to dismiss the Woodmont Defendants' Eighth Separate Defense – a defense to liability under CERCLA based on the Federal Insecticide and Rodenticide Act, 42 U.S.C. § 9601(i).  Because the Woodmont Defendants are not liable under CERCLA, this issue is moot.

### III.  CONCLUSION

For the reasons set forth above, the Woodmont Defendants' motion for summary judgment dismissing all counts of the SAC is granted in part and denied in part and the Plaintiffs' motion for partial summary judgment is granted in part and denied in part.  Counts One (CERCLA § 107), Two (CERCLA § 113), Three (Declaratory Judgment under CERCLA § 113), Five (Spill Act), Seven (Breach of Contract), Eight (Breach of the Implied Covenant of Good Faith and Fair Dealing), Ten (Negligence claim against Woodmont and the Individual Defendants), Eleven (Fraudulent Misrepresentation), Thirteen, (Abnormally Dangerous Activity), and Fourteen (Implied Warranty of Habitability) of the SAC are dismissed.

Count Six of the SAC (NJCFA) is dismissed as asserted by all Plaintiffs except Sharon Perrone, Daniel Roh, and James Sadowski; their claims under the NJCFA based on the statements of Mr. Tomback discussed herein are the only claims under the NJCFA to survive this motion for summary judgment.

Count Twelve of the SAC (Negligent Misrepresentation) is dismissed as asserted by all Plaintiffs except Sharon Perrone, Daniel Roh, and James Sadowski; their claims of negligent misrepresentation based on the statements of Mr. Tomback discussed herein are the only claims of negligent misrepresentation to survive this motion for summary judgment.

The Woodmont Defendants' motion for summary judgment dismissing Count Four (RCRA) of the SAC is denied; the Plaintiffs' motion for summary judgment on Count Four (RCRA) is also denied.

All Counterclaims (One, Two and Three) asserted against the Plaintiffs are dismissed.

Montville's motion for summary judgment dismissing Count Fifteen (Negligence) of the SAC is granted.

The Woodmont Defendants' Eighth Separate Defense is dismissed as moot.

The Court will enter an order implementing this opinion.


_____*/S/ Dickinson R. Debevoise*_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: September 22, 2009